UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

NATIONAL AUTO LENDERS, INC.,
a Florida Corporation

                               Civil Action No.:     09-21765-CIV-
         Plaintiff,                                COOKE/BANDSTRA

v.

SYSLOCATE, INC., a Delaware
Corporation, DRIVEOK, INC., a California
Corporation, and PROTECT & CONNECT,
INC., a Tennessee Corporation, and as
successor in interest to SYSLOCATE, INC.,
and DRIVEOK, INC.

         Defendants.

_____/

## NOTICE OF FILING AFFIDAVIT OF MARK WELLS, EXHIBIT 4 TO DEFENDANTS SYSLOCATE, INC., DRIVEOK, INC., AND PROCON, INC'S MOTION TO DISMISS AND/OR TRANSFER VENUE AND STAY PROCEEDINGS TO COMPEL MEDIATION AND ARBITRATION

NOW INTO COURT, through undersigned counsel, come the Defendants, SYSLOCATE, INC., DRIVEOK, INC., and PROCON, INC., and as successor in interest to SysLOCATE, INC., and DriveOK, INC, and hereby file the Affidavit of Mark Wells, Exhibit 4 to Defendants' Motion to Dismiss and/or Transfer Venue and Stay Proceedings to Compel Mediation and Arbitration.

Dated: August 14, 2009                KUBICKI DRAPER, P.A.
                                       Attorneys for Defendants
                                       City National Bank Building
                                       25 West Flagler Street, Penthouse
                                       Miami, Florida 33130
                                       Direct Line: (305) 982-6632

                                By:    /s/ Steve W. Cornman
                                       STEVE W. CORNMAN, ESQ.
                                       sc@kubickidraper.com
                                       Florida Bar No.: 0755281

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 14, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached service list in the manner specified, either via transmissions of Notices of Electronic Filing generated by CM/ECF or by U.S. mail for those counsel who are not authorized to receive electronic Notices of Electronic Filing.

                                       /s/ Steve W. Cornman

## **SERVICE LIST**

Elizabeth M. Bohn, Esq.
Jorden Burt, LLP
777 Brickell Avenue, Suite 500
Miami, FL 33131
*Counsel for the Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

NATIONAL AUTO LENDERS, INC.,
a Florida Corporation

        Plaintiff,

v.

SYSLOCATE, INC., a Delaware
Corporation, DRIVEOK, INC., a California
Corporation, and PROTECT & CONNECT,
INC., a Tennessee Corporation, and as
successor in interest to SYSLOCATE, INC.,
and DRIVEOK, INC.

        Defendants.

Civil Action No.:   09-21765-CIV-
                    COOKE/BANDSTRA

_____/

## DECLARATION OF MARK WELLS

1. I, Mark Wells, hereby declare as follows:

2. I am Mark Wells, Chief Technical Officer of PROCON, Inc., and am competent to testify as to the factual information set forth in this Declaration. The statements made in this Declaration are true based on my personal knowledge and the business records of PROCON, Inc.

3. PROCON, Inc., is a Tennessee Corporation, and manufactures, develops, markets, and sells GPS vehicle trackers to automobile dealers, rental car companies and auto finance companies.

4. PROCON, Inc.,'s headquarters are located in Knoxville, Tennessee. As such, its representatives and files are situated in Knoxville, Tennessee.

5.  In November 2008, PROCON, Inc., merged with Syslocate and DriveOK, and PROCON is now the surviving corporation, successor in interest to Syslocate and DriveOK, and continues to operate the same business as was formerly operated by said companies.

6.  PROCON initiated a Subscription Service click-to-accept agreement specifically for its GPS tracking website used by Plaintiff in April 2009,  which asked parties to electronically agree to said agreements prior to using tracking services.

7.  In April 2009, a flag was captured on PROCON's, Inc., website indicating that Plaintiff accepted the April 2009 Subscription Service Agreement that was posted on mobilesecurezone.com.

8.  An amended version of the Subscription Service Agreement was uploaded to the GPS tracking web sites in May 2009.

9.  Beginning in May 2009, PROCON, Inc., commenced capturing date and time, IP address, agreement name and website when a customer accepted an agreement at first login on web sites utilized by distributors and end users.

10. The following log was captured for National Auto Lenders for PROCON's May 2009 Subscription Service Agreement:

    a.  Customer ID: C12023259

    b.  Company Name: National Auto Lenders

    c.  Customer Name: Ralph Long

    d.  IP address: 64.80.234.59

    e.  Agreement: Universal Subscription Service

    f.  Website: GOLDSTAR (http://trak.goldstargps.com)

    g.  Stamp Date (PST): 2009-05-29 12:56:46.513

11. The Subscription Service Agreement attached, herein, is an accurate and complete copy of the contract posted on the PROCON website in May 2009. [See Subscription Service Agreement, attached hereto as Exhibit "A."]

12. A Master Marketing click-to-accept was introduced to PROCON's distributor websites in May 2009, which asked parties to electronically agree to said agreements prior to placing orders.

13. The following log was captured for National Auto Lenders for PROCON's May 2009 Master Marking Agreement:

    a. Distributor ID: D0102534

    b. Company Name: National Auto Lenders

    c. IP Address: 75.203.117.42

    d. Agreement: Master Marketing Agreement 2009.05.19

    e. Website: Distributor Portal (http://webapps.protectandconnect.com)

    f. Stamp Date (PST): 2009-06-01 10:21:47.000

14. The Master Marketing Agreement attached, herein, is an accurate and complete copy of the contract posted on the PROCON website in May 2009. [See Master Marketing Agreement, attached hereto as Exhibit "B."]

15. The agreements herein were instituted to establish certain operating policies and procedures for all PROCON's customers and distributors and to protect PROCON's interest, as SysLOCATE and DriveOK had previously operated without agreements.

16. I hereby declare under penalty of perjury that the foregoing Declaration is true and correct.

(Mark Wells)

Executed on August 14, 2009.

**Subscription Service Agreement
and Terms of Purchase**

THIS SUBSCRIPTION SERVICE AGREEMENT AND TERMS OF PURCHASE ("AGREEMENT")
IS MADE AND ENTERED INTO IMMEDIATELY UPON ACCEPTANCE OF ITS TERMS AND
CONDITIONS BY YOU AND IS BETWEEN YOU AND COMPANY, AS IDENTIFIED IN THE LAST
PARAGRAPH OF THIS AGREEMENT.

THIS AGREEMENT CONTAINS THE TERMS AND CONDITIONS WHICH APPLY TO THE GPS
PRODUCT(S) YOU HAVE PURCHASED OR ARE PURCHASING, WHETHER PURCHASED FROM
COMPANY, A DISTRIBUTOR, AGENT OR FROM ANY ENTITY ACQUIRED BY COMPANY
(COLLECTIVELY THE "PRODUCT") AND UPON WHICH COMPANY WILL PROVIDE OR HAS
PROVIDED TO YOU THE SERVICES (AS DEFINED BELOW) RESPECTING SUCH PRODUCT. YOU
SPECIFICALLY AGREE THAT THIS AGREEMENT SUPERCEDES ANY PRIOR OR
CONTEMPORANEOUS AGREEMENT BETWEEN YOU AND ANY PERSON OR ENTITY,
WHETHER WRITTEN OR ORAL, WITH RESPECT TO ANY PRODUCT AND/OR SERVICES, AS
DEFINED HEREIN. NOTWITHSTANDING THE FOREGOING, IF YOU ARE A DISTRIBUTOR,
SALES REPRESENTATIVE OR OTHER PERSON OR ENTITY WHO HAS PURCHASED A
PRODUCT FOR THE PURPOSE OF RESALE, THEN THE TERMS OF THIS AGREEMENT WILL
ONLY SUPERCEDE ANY PRIOR OR CONTEMPORANEOUS AGREEMENT BETWEEN YOU AND
COMPANY TO THE EXTENT THE PROVISIONS OF SUCH PRIOR OR CONTEMPORANEOUS
AGREEMENT CONFLICT WITH THE TERMS HEREIN, IT BEING THE INTENT OF ALL PARTIES
THAT THE TERMS OF THIS AGREEMENT SHALL GOVERN.

1. **SERVICES AND CHARGES** - In consideration of payment of the Charges (as defined below),
   Company will provide the Services (as defined below). The term "Services" means, collectively, (a) the
   provision to you of location, operation and other information (including, without limitation, the location
   of the vehicle, notifications of when the vehicle goes into motion and such other information concerning
   the location and/or operation of the vehicle as Company may elect to provide from time to time), (b) if
   you purchased such option, the provision to you of start, stop and idle times, fuel consumption, and top
   speeds of the Monitored Vehicle, (c) if you purchased such option, the ability to disable and enable the
   ignition system of the Monitored Vehicle using the Website and certain Company supported mobile
   devices, (d) if you purchased such option, the ability to lock and unlock the entry doors of the Monitored
   Vehicle using the Website and certain Company supported mobile devices, (e) if you purchased such
   option, notification to the owner of the Monitored Vehicle while it is in operation of a payment
   delinquency with respect to the loan which financed the purchase of the vehicle, and (f) such other
   services as Company may elect to provide to you in its sole and absolute discretion from time to time.
   With respect to all Services, Services will only be available for a vehicle on which the Product is properly
   installed and is properly registered (the "Monitored Vehicle") and will only be provided through a
   Company website providing Services ("Website") or using such other means as Company may elect from
   time to time. There are no other services provided under this Agreement. The term "Charges" means the
   total amount due for the Product and Services, including without limit any applicable late charges,
   penalties or interest, purchased by you from time to time and all sales, use and other taxes, fees and
   charges that may be imposed by any governmental body relating to the sale of Products and provision of
   Services.

2. **PAYMENT TERMS** - You will receive an invoice with the shipment of the Product setting forth the
   purchase price and other Charges applicable to the Product and the Services provided hereunder. Unless
   such charges have been paid prior to shipment, you will pay all Charges set forth in the invoices C.O.D.
   provided however, Company in its sole and absolute discretion may provide payment terms in the invoice.
   At Company's request, prior to the shipment of any Products to you, you will provide to Company a valid
   credit card number, the expiration date and other information requested by Company pertaining thereto,
   and you hereby authorize Company to charge to this credit card all Charges applicable to your purchase

EXHIBIT
A

of the Product and Services provided hereunder which are not paid prior to their shipment or upon delivery. Upon cancellation or expiration of such credit card, you will immediately provide a new credit card number, expiration date and other information requested by Company pertaining thereto. If you have not paid all sums due Company in accordance with the terms hereof, a monthly finance charge equal to the greater of (a) 1.5% per month, or (b) the highest amount permitted by law, shall accrue and be payable each month until paid in full. Furthermore, upon your failure to make payment in accordance with the terms hereof, a late fee of ten percent (10%) of the amount past due shall be due and payable by you with respect to each such late payment. The waiver of a finance charge, late fee or any portion thereof shall not be deemed to be a waiver of any future finance charges or late fees. You shall be liable to Company for any and all costs and expenses incurred by Company, including without limitation attorneys' fees and expenses, in collection of any past due amounts hereunder. You hereby grant to Company a continuing lien in the Product to secure your timely payment to Company for such Product in accordance with the terms and conditions hereof.

3.  **LIMITED SOFTWARE LICENSE** - In consideration of the payment of the Charges, Company grants to you a nonexclusive, nontransferable license to use the software loaded on the Product solely for the purpose of enabling Company to provide the Services described herein with respect to the Product. This limited software license will automatically terminate upon termination of the Services. You shall not modify, reverse engineer, decompile, or disassemble any licensed software.

4.  **LIMITED PRODUCT WARRANTY** - Company hereby warrants ("Limited Warranty") only to the purchaser that first activates the Product, that the Product will be free from defects in workmanship and materials for a period ("Limited Warranty Period") of one (1) calendar year after the date that you purchased the Product. The Limited Warranty does not apply to normal wear and tear and does not cover repair or replacement if the Product is damaged by tampering, misuse, accident, abuse, neglect, improper installation, misapplication, alteration of any kind, disaster, defects due to repairs or modifications made by anyone other than Company or an authorized service representative of Company, or reception problems caused by signal conditions or cable or antenna systems outside the Product. Further, the Limited Warranty does not apply to physical damage of any nature whatsoever to the Product, including any opening or attempted opening of the Product, and any such opening or attempted opening of the Product shall render the Limited Warranty invalid. REPAIR OR REPLACEMENT OF A DEFECTIVE PRODUCT IS YOUR SOLE AND EXCLUSIVE REMEDY UNDER THE LIMITED WARRANTY. SOFTWARE LOADED ON THE PRODUCT IS PROVIDED "AS IS" WITHOUT WARRANTY. COMPANY SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES FOR BREACH OF THE LIMITED WARRANTY. TO THE MAXIMUM EXTENT PERMITTED BY LAW, COMPANY EXPRESSLY DISCLAIMS, AND YOU EXPRESSLY WAIVE, ALL OTHER WARRANTIES, WHETHER EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING WITHOUT LIMITATION ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE, OR ANY WARRANTY ARISING OUT OF ANY PROPOSAL, SPECIFICATION, OR SAMPLE. THE TERM OF ANY IMPLIED WARRANTIES THAT CANNOT BE DISCLAIMED UNDER APPLICABLE LAW SHALL BE LIMITED TO THE DURATION OF THE FOREGOING EXPRESS WARRANTY PERIOD. SOME STATES DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES AND/OR DO NOT ALLOW LIMITATIONS ON THE AMOUNT OF TIME AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATIONS MAY NOT APPLY TO YOU. THIS LIMITED WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS. YOU MAY HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE. You agree that neither Company nor any other party has made any representations or warranties, nor have you relied on any representations or warranties, express or implied, including any implied warranty of merchantability or fitness for any particular purpose with respect to the Products. You acknowledge that no affirmation of fact or statement (whether written or oral) made by Company, its representatives, or any other party outside of this Agreement with respect to the Products shall be deemed to create any express or implied warranty on the part of Company or its representatives. To obtain warranty service Contact the Customer Service Department using the

support number located on the website you were provided when you purchased the product. Provide them with the ESN (Equipment Serial Number) for each product for warranty coverage verification. Upon verification of coverage, an RA# will be issued and provided to you by fax, email, or over the phone. Package product(s) and send to Procon with the RA# clearly written on the outside of each package (returns without an RA# will be rejected) and ship to: **PROCON Returns, 11120 Roselle Str., Suite A, San Diego, CA 92121** (*Note: You are responsible for shipping charges to the returns department.*) Procon will test all properly returned products to determine if they are defective. If the product is defective Procon will provide replacement of the defective product(s) and Procon is responsible for shipping charges back to you. If the product is not defective then you will be charged $9.95 to cover the cost of testing the product and you are responsible for the shipping charges back to you.

5.   **NO SERVICE WARRANTY** – There is no warranty with respect to Services, and Company makes no warranty under this Agreement except as specifically stated herein. ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY SPECIFICALLY DISCLAIMED. You assume all risk for loss of or damage to the Monitored Vehicle and its contents and for personal injury to persons occupying or affected by your Monitored Vehicle, and Company shall have no liability of any kind or nature to you therefor. You agree that neither Company nor any other party has made any representations or warranties, nor have you relied on any representations or warranties, express or implied, including any implied warranty of merchantability or fitness for any particular purpose with respect to the Services. You acknowledge that no affirmation of fact or statement (whether written or oral) made by Company, its representatives, or any other party outside of this Agreement with respect to the Services shall be deemed to create any express or implied warranty on the part of Company or its representatives.

6.   **INSTALLATION** - The Product must be installed strictly as provided in the installation guide supplied with the Product. You are responsible for obtaining the proper installation of the Product in the Monitored Vehicle in accordance with this Section. YOU UNDERSTAND AND AGREE THAT COMPANY IS NOT RESPONSIBLE FOR, SHALL HAVE NO OBLIGATIONS WITH RESPECT TO, AND SHALL HAVE NO LIABILITY FOR, A PRODUCT NOT INSTALLED IN ACCORDANCE WITH THIS SECTION.

7.   **LIMITATIONS, EXCLUSIONS & DISCLAIMERS** - You agree that the liability of Company, the Wireless Carrier (as defined below) and any third party CSC (as defined below) is limited in accordance with, and Company, the Wireless Carrier and any third party CSC may invoke, the provisions of this Section 7.

   (a)  LIMITATION OF LIABILITY - COMPANY SHALL NOT BE LIABLE TO YOU OR ANY OTHER PERSON FOR ANY GENERAL, DIRECT, SPECIAL, INCIDENTAL, LOST PROFITS, AND EXEMPLARY, PUNITIVE AND/OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THE SERVICES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFIT OR REVENUES, LOSS OF USE, LOSS OF DATA, INCORRECT OR CORRUPTED DATA, COST OF CAPITAL, COST OF SUBSTITUTE GOODS, FACILITIES, SERVICES OR REPLACEMENT POWER, DOWNTIME COST, OR CLAIMS OF YOU FOR SUCH DAMAGES, EVEN IF COMPANY KNEW OF OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. WITHOUT LIMITING THE FOREGOING OR ANY OTHER LIMITATION OF LIABILITY HEREIN, REGARDLESS OF THE FORM OF ACTION, WHETHER FOR BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE, YOUR EXCLUSIVE REMEDY AND THE TOTAL LIABILITY OF COMPANY AND/OR ANY SUPPLIER OF SERVICES TO COMPANY ARISING IN ANY WAY IN CONNECTION WITH THIS AGREEMENT, FOR ANY CAUSE WHATSOEVER, INCLUDING BUT NOT LIMITED TO ANY FAILURE OR DISRUPTION OF THE SERVICES, SHALL BE LIMITED TO PAYMENT BY COMPANY

OF DAMAGES IN AN AMOUNT EQUAL TO THE AMOUNT CHARGED TO YOU FOR THE PRODUCT AND SERVICES PROVIDED UNDER THIS AGREEMENT.

(b) <u>Company Not An Insurer</u>- Company is not an insurer and you must obtain from an insurer any insurance you desire.  The amount you pay Company is based upon the Services Company performs and the limited liability Company assumes under this Agreement and is unrelated to the value of your property, any vehicle in which a Product is installed or any property located in any vehicle in which a Product is installed.  In the event of any loss or injury to any person or property, you agree to look exclusively to your insurer to recover damages.  You waive all subrogation and other rights of recovery against Company that any insurer or other person may have as a result of paying any claim for loss or injury to any other person.

(c) <u>State Laws Differ</u>- Some states may not allow limitations of special, incidental, consequential, or exemplary damages, and the limitations specified herein may not apply to you.

(d) <u>Other Party's Limitation</u> - If you purchased Services or the Product through another business or person, or from Company through a referral from another business or person, you agree that such other business or person acts solely as an independent contractor.  Such business or person shall have no responsibility or liability to you for the performance or nonperformance of the Services Company provides under this Agreement.  Without limiting the above, you agree that the liability of such other business or person is, in any event, limited in accordance with the provisions of this Agreement.  You agree that such business or person and its agents, employees, subsidiaries, affiliates and parent companies may invoke all of Company's rights under this Section.

(e) <u>Time To File Lawsuit Or Other Action</u> - You agree to file any lawsuit or other action you may have against Company or Company's agents, employees, subsidiaries, affiliates or parent companies within one (1) year from the date of the event that caused the loss, damage or liability.

(f) <u>DISCLAIMER & LIMITATION OF LIABILITY RELATED TO GPS AND CELLULAR SERVICE</u> - The Product receives signals from the Global Positioning Satellite ("GPS") system and transmits signals to, and receives signals from, a Company or a third party Customer Service Center ("CSC").  Your Services are provided either by a Company CSC or an independent CSC which Company selects.  You understand that the Product installed in the Monitored Vehicle uses cellular telephone technology as the transmission mode for sending signals to the CSC.  Services are available to you only within the United States only when the Product is within the operating range of the Wireless Carrier (as defined below).  Services may be temporarily refused, interrupted, curtailed, limited or discontinued, without liability to Company or the Wireless Carrier, due to many conditions, including: (a) wireless transmission capacity limitations and cellular telephone network capacity limitations, (b) atmospheric, terrain and geographic conditions, (c) other natural or artificial environment conditions beyond Company's control, (d) limitations of the electrical system design and architecture of your Product, (e) the condition of the Product (for example, the Product will not function if its power supply is not available as when, for example, the unit is not connected to a live power source, or if essential Product components are damaged (accidentally or otherwise), (f) government regulations or limitations, (g) restrictions by the Wireless Carrier (for example, wireless carrier equipment limitations and inter-carrier roaming agreements), (h) usage concentrations, modifications, upgrades, relocation and repairs of transmission facilities for the cellular telephone network, (i) Company's efforts to combat fraudulent use, and (j) other legitimate business and operational reasons.  Global positioning capabilities used for some location-based services are not available if satellite signals are obstructed; you must be outside with a clear line of sight between you and the satellites.  You understand that the Product's usage of the GPS system and the cellular telephone network are fundamental to Company's ability to provide Services.  You understand that due to the very nature of cellular telephone, network and GPS technologies, there will be times when the Product

is unable to secure, maintain, or transmit signals, or that the information transmitted is not reliable, and thus, Company will be unable to receive such signals. You also understand that Company does not receive signals when the transmission mode is or becomes non-operational and that signals from the Product cannot be received by Company when the Product is damaged, does not have an adequate power source or is otherwise non-operational. Accordingly, you agree that Company shall not, in any way, be liable for, or have responsibility with respect to, the GPS system, the cellular telephone network, any of the information obtained therefrom, or for interruptions in service for any reason whatsoever. You further acknowledge and agree that Company shall not have any liability for the interruption of services due to electrical storms, power failures, interruption or unavailability of telephone service, cellular and radio frequency or other conditions beyond Company's control, including, without limit, due to strikes, riots, floods, fires or acts of God. You acknowledge that the use of radio frequencies and cellular devices that the liability and obligations of Company to you under this Agreement for Services are strictly controlled and limited by the Federal Communications Commission ("FCC") and other governmental authorities which from time to time have jurisdiction and that changes in rules, regulations and policies may necessitate discontinuing such transmission devices by Company or the Wireless Carrier at Company's or the Wireless Carrier's option. In no event shall Company and/or the Wireless Carrier be liable for any cost, delay, failure or disruption of the Wireless Service (as defined below), lost profits, or incidental, special, punitive or consequential damages.

(g) <u>DISCLAIMER & LIMITATION OF LIABILITY RELATED TO PSAP or 911 SERVICE AND ANY THIRD PARTY CSC</u> - In no event shall Company be liable for losses, damages, or claims arising out of your use or attempted use of a public service answering point ("PSAP") or 911 services or for your inability to access PSAP or 911 services. You understand and agree that you have no contractual relationship with any third party CSC and that you are not a third party beneficiary of any agreement between Company and any third party CSC. In addition, you expressly understand and agree that any third party CSC shall have no legal, equitable, or other liability of any kind to you, and you hereby waive any and all such claims or demands.

8. **<u>PRIVACY DISCLOSURES AND COMPLIANCE WITH LAWS</u> – YOU AGREE TO PROVIDE ANY AND ALL DISCLOSURES TO EACH OWNER OR OPERATOR OF A MONITORED VEHICLE AND TO TAKE ANY AND ALL SUCH OTHER ACTIONS AS MAY BE NECESSARY TO COMPLY WITH ALL LAWS (WHETHER STATUTORY, UNDER COMMON LAW OR OTHERWISE), RULES OR REGULATIONS APPLICABLE TO USE OF THE PRODUCT AND THE SERVICES AND THE INSTALLATION OF THE PRODUCT IN THE MONITORED VEHICLE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, YOU AGREE TO PROVIDE FULL AND ADEQUATE ADVANCE WRITTEN DISCLOSURE TO EACH OWNER OR OPERATOR OF A MONITORED VEHICLE THAT THE PRODUCT IS INSTALLED IN SUCH VEHICLE. FURTHER, IF APPLICABLE YOU AGREE TO PROVIDE FULL AND ADEQUATE ADVANCE WRITTEN DISCLOSURE (A) THAT COMPANY WILL BE PROVIDING THE SERVICES TO YOU RESPECTING SUCH PRODUCT, AND (B) THE NATURE AND EXTENT OF THE SERVICES BEING PROVIDED BY COMPANY TO YOU RESPECTING SUCH PRODUCT (e.g., THAT YOU ARE ABLE TO DETERMINE THE PRECISE LOCATION OF THE MONITORED VEHICLE AT ANY TIME AND, IF APPLICABLE, THAT YOU HAVE THE ABILITY TO LOCK THE DOORS OR DISABLE THE IGNITION SYSTEM OF THE MONITORED VEHICLE AT ANY TIME). NEITHER YOU NOR ANY OF YOUR EMPLOYEES, AGENTS, OR REPRESENTATIVES, DIRECTLY OR INDIRECTLY, WILL USE THE PRODUCT OR SERVICES FOR UNLAWFUL OR OTHERWISE IMPROPER PURPOSES, INCLUDING, WITHOUT LIMITATION, MONITORING THE LOCATION OF THE MONITORED VEHICLE OR DISABLING THE MONITORED VEHICLE FOR ANY PURPOSE OTHER THAN FOR A LEGITIMATE BUSINESS PURPOSE.**

9. **TERM** – The term of this Agreement shall begin immediately upon your acceptance of the Agreement and shall continue until the expiration of the initial service term purchased by you or for you for such Product, unless such term is renewed by you pursuant to renewal procedures which are established by Company and which may be in effect from time to time.

10. **TERMINATION OR DISCONTINUANCE OF SERVICES** - This Agreement or the Services may be terminated at the option of Company at any time upon the occurrence of any of the following events: (a) your default under or failure to perform as required by this Agreement; (b) your default in payment of any monies due under this Agreement; (c) IF YOU PURCHASED PRODUCT OR SERVICES THROUGH ANOTHER BUSINESS OR PERSON, THE DEFAULT IN PAYMENT OF ANY MONIES DUE TO COMPANY FROM SUCH BUSINESS OR PERSON; (d) destruction of or substantial damage to the CSC's so as to make it impractical for Company to continue to provide signal receiving and notification services under this Agreement; (e) failure of the Product, the GPS system and/or the cellular telephone networks for the transmission of signals between the Product and the CSC's to function in accordance with Company's expectations, (f) unavailability of, or inability of Company either to obtain or retain the connections or privileges necessary for the transmission of signals by means of conductors between the CSC's, the Wireless Carrier and the PSAP's, police agencies or other service providers; (g) your failure to follow the operating instructions provided at the time the Product is installed into a Monitored Vehicle; (h) your failure to follow any recommendations Company may make for the repair or replacement of a defective part of a Product; (i) if a Monitored Vehicle is so modified or altered after installation of the Product as to render continuation of any Service impractical; (j) in the event any governmental regulations or limitations necessitate the discontinuance of the Product or Services as determined by Company in its sole discretion; or (k) your default, failure to pay any monies due or perform any obligation under any other agreement between you and Company, including, without limitation, any other Subscription Service Agreement between you and Company. In the event this Agreement is terminated by Company under this provision, Company shall not be liable for any damages or subject to any penalty as a result of such termination. Company will, however, where you are not at fault, refund to you any advance payments made for Services to be supplied subsequent to the date of such termination, less any amount still due for the period prior to such termination. This Agreement may also be terminated at the option of Company at any time with thirty (30) days written notice to you. In addition to Company having the option to terminate this Agreement, upon the occurrence of any of the events set forth in this Section, Company shall also have the option to discontinue the Services to the Product until the event resulting in such discontinuance is cured by you or otherwise remedied in Company's sole and absolute opinion, and other than discontinuances which are not the result of any act or omission by you, you shall remain liable for any and all Charges applicable to the Product and Services for such period of discontinuance.

11. **WIRELESS CARRIER** - Company has contracted with, and will contract from time to time with, one or more wireless carriers (individually and collectively, "Wireless Carrier") to provide wireless data transmission service ("Wireless Service") for the Product over a cellular telephone network. You acknowledge and agree that you have no contractual relationship with the Wireless Carrier, and you are not a third party beneficiary of any agreement between Company and the Wireless Carrier. You understand and agree that the Wireless Carrier shall have no legal, equitable or other liability of any kind to you, and you hereby waive any and all such claims or demands. You acknowledge and agree that your Service may be temporarily suspended or permanently terminated upon little or no notice in the event that Company's agreement with the Wireless Carrier is terminated. You waive any and all claims against the Wireless Carrier for such suspension or termination. You understand that the Wireless Carrier cannot guarantee the security of wireless transmissions and will not be liable for any lack of security relating to the use of the Wireless Service. Subject to FCC number portability rules, you have no property right in any telephone number assigned to you or the Product ("Number"), and you understand and agree that any such Number can be changed from time to time.

12. **INDEMNIFICATION** - You agree to indemnify, defend and hold Company, the Wireless Carrier, and the officers, directors, employees, agents, contractors, subsidiaries, affiliates, or parent companies of each of them (each an "Indemnified Person") harmless from any loss, cost, expense (including attorney's fees, expert's fees, and expenses), demand, claim, liability, damages or cause of action of any kind or character (collectively referred to as "claim"), including without limitation, for any personal injury or death, in any manner arising out of or relating to your, or your officers, directors, employees, agents, assigns, invitees, or other users using your Product, whether authorized or not (i) violate or otherwise breach of any provision of this Agreement, (ii) acts or omissions in the conduct of your business, including, without limitation, the marketing and sale of the Products and Services; (iii) statements, representations, warranties or other conduct in connection with any transaction involving the Products and/or Services, other than as expressly provided to you by Company or otherwise expressly authorized by Company in writing; (iv) negligence, recklessness or intentional misconduct; (v) the provision, failure, or use of the Products and/or the Services, including, without limitation, the compliance with any and all laws (whether statutory, under common law or otherwise), rules or regulations applicable to the use of the Products or Services; (vi) inability to use the Services or the Product; (vii) the use, failure to use, or inability to use the Number; (viii) the installation of the Product in the Monitored Vehicle; and (ix) Company's refusal to provide Services because you or any other Service user has (A) not paid monies due to Company for Products or Services or (B) violated any provision of this Agreement. These obligations will apply even if such lawsuit or other claim arises out of an Indemnified Person's negligence, gross negligence, failure to perform duties under this agreement, strict liability, failure to comply with any applicable law, or other fault. This provision shall survive the termination of this Agreement.

13. **WEBSITE** – You acknowledge and agree that the information and Services provided by Company are accessed by you in part through the Website. You accept and agree to comply with the Terms of Use, Privacy Policy, Acceptable Use Policy, and copyright and trademark notices of Company posted on the Website and in effect from time to time. You acknowledge and agree that, because the Services are provided in part through the Website, it is necessary for you to have computer equipment and an internet connection that meets minimum specifications published by Company from time to time on the Website, and you acknowledge and agree to periodically update your computer equipment and/or internet connection to meet such minimum specifications. You acknowledge that the Services may be interrupted due to (a) Website downtime for scheduled maintenance at Company's sole discretion, or (b) interruptions in internet connectivity or other Website downtime caused by circumstances beyond Company's control, including, without limitation, acts of God, acts of government, flood, fire, earthquakes, civil unrest, acts of terror, strikes or other labor problems, computer or telecommunications failures, or delays involving hardware of software not within Company's control, network intrusions or denial of service attacks. You agree that Company shall not, in any way, be liable for, or have responsibility with respect to, any such Service interruptions.

14. **USER ID AND PASSWORD** – During the registration process for your Product you created a user id and password that allows you to have access to the Services through the Website. You will not provide your user name or password to access Services to any other person or entity, or allow any other person or entity to access Services provided to you under your user name and password. You agree that you are solely responsible for any actions that occur under your user name and password. In the event that your user name and password becomes known by a third party you agree to notify Company immediately.

15. **ASSIGNMENT** - This Agreement is not assignable by you except upon the prior written consent of Company. Company shall have the right to assign this Agreement, in whole or in part, or to subcontract its obligations under this Agreement, in whole or in part, without notice to you and upon such assignment, Company shall be released from all liability hereunder.

16. **NOTICES** - Except as specifically provided in this Agreement, all notices required hereunder shall be in writing and shall be given by personal delivery, overnight courier service, first class mail postage prepaid, at the parties' addresses set forth herein or at such other address(es) as shall be specified in writing by

such party to the other party in accordance with the terms and conditions of this Section. All notices shall be deemed effective upon personal delivery, or one business day following deposit with any overnight courier service, or three business days following deposit with the U.S. Postal System, first class postage attached, in accordance with this Section. Notices for you shall be sent to the address you provide to Company upon registration of the Product. Notices for Company shall be sent to the address set forth for Company in the Preamble.

17. **MEDIATION/ARBITRATION -**

(a)     In the event of any dispute under this Agreement, the parties hereto desire to avoid litigation. Accordingly, the aggrieved party will give notice of the dispute to the other party and both parties will attempt to settle the dispute during the thirty (30) day period following such notice. If such dispute remains unsettled, the parties agree to then submit such dispute to mediation. If the parties cannot agree on a mediator, each will select a mediator and the two chosen mediators will select a third mediator who shall alone hear the dispute. Such mediation will, if possible, be conducted during the sixty (60) day period following expiration of the thirty (30) day period. If such mediation fails to resolve the dispute, the parties agree such dispute will be submitted to final and binding arbitration in accordance with the rules of the American Arbitration Association. Unless otherwise directed by the arbitrator, such arbitration must be concluded within ninety (90) days of the expiration of the sixty (60) day period previously specified for mediation. If the parties cannot agree on a single arbitrator, each will select an arbitrator, and the two chosen arbitrators will select a third arbitrator who shall alone decide the dispute. Any mediation or arbitration conducted hereunder will be conducted in Knoxville, Tennessee. The parties hereto shall equally share the costs of mediation (including the mediator's fees and expenses and costs directly related to the conduct of the mediation, but excluding each party's direct costs for transportation, attorneys, etc., for which each will be responsible). If any party fails to participate in mediation or arbitration after receipt of notice thereof, then each party hereto agrees that the other party shall have the right to proceed immediately to arbitration and that such other party shall be entitled to select the arbitrator in its sole discretion. Each party further agrees that, in such event, such arbitrator shall have the right to decide the dispute as if the non-participating party were participating in the arbitration and that such decision shall be final and binding upon each party hereto.

(b)     Attorney Fees and Other Arbitration Expenses. If any party hereto resorts to arbitration to remedy a breach of this Agreement, the prevailing party in the arbitration, in addition to any other remedies available under this Agreement or by law, may collect all or a portion of its reasonable attorney fees and other costs and expenses of arbitration at the discretion of the arbitrator, who shall consider both the reasonableness of the attorney fees and other costs and the relative merits of each party's position. It is the intent of all parties hereto to avoid arbitration without preventing a party from seeking redress for a valid dispute. To that end, all parties express their intent and agreement that unreasonable attorney fees and costs not be awarded, and that all or a portion of reasonable attorney fees and costs be awarded when in the arbitrator's opinion the party against whom such fees and costs are awarded has maintained position(s) which have significantly less merit compared to the prevailing party's position(s). Further, it is all parties intent that any party seeking redress through litigation despite the fact that arbitration is required by this Agreement, shall not be entitled to recover any attorney fees or costs for such litigation or in any subsequent arbitration, regardless of the outcome of such litigation or subsequent arbitration.

18. **VENUE** - It is the express intent of the parties that any dispute under this Agreement be decided in accordance with the mediation and arbitration provisions contained in Section 17 hereof. Notwithstanding the foregoing, in the event a court refuses to enforce the provisions contained in Section 17 for any dispute or, in the event a court is asked to decide a dispute concerning the provisions contained in Section 17, the parties expressly agree that jurisdiction and venue for any actions under or pursuant to this Agreement shall be solely in any state court in Knox County, Tennessee, or the Federal District Court for the Eastern District of Tennessee, Northern Division, sitting in Knoxville, Tennessee.

19. **MISCELLANEOUS** - The terms and conditions hereof shall be governed by and construed in accordance with the laws of the State of Tennessee without resort to its conflicts of laws. The invalidity, in whole or in part, of any term or condition hereof shall not affect the validity of the remainder hereof. The failure of either Company or you to enforce at any time any of the terms and conditions hereof shall not constitute or be construed to be a waiver of such terms and conditions or of the right of such party thereafter to enforce any such terms and conditions. You are solely responsible for complying with any orders, rules, and regulations of the Federal Communication Commission, or any other federal, state or local governmental authority, applicable to the purchase, installation, and operation of Product. Except as expressly provided herein, the terms and conditions hereof are for the benefit of Company and you and no other party. This Agreement constitutes the final and entire agreement between you and Company and supersedes any prior agreements, written or oral. There are no other agreements written or oral. Company has made no representation, warranty, or covenant not contained in this Agreement. Further, no amendment, modification, or waiver of, or supplement to, this Agreement shall be effective, unless it is in writing. Company may send you written notification of any modification, amendment or supplement to this Agreement and you will have sixty (60) days from the date of such written notification to object in writing to such modification, amendment or supplement, in which case Company will have the right to either terminate this Agreement or allow this Agreement to continue without the proposed modification, amendment or supplement. Failure to object to any modification, amendment or supplement in writing will constitute your acceptance of such modification, amendment or supplement. The agreements made herein may not be modified, supplemented, or changed in whole or in part by any waiver (other than a written waiver signed by the party to be charged), oral representation, or course of dealing. The terms and conditions of this Agreement shall govern notwithstanding any inconsistent or additional terms and conditions of any other document submitted by you.

20. **COMPANY** – Company, as used throughout this Agreement, means PROCON, Inc., and its successors and/or assigns, whose offices are located at 2035 Lakeside Centre Way, Suite 125, Knoxville, Tennessee 37922.

**BY CLICKING "I ACCEPT" BELOW, YOU ARE REPRESENTING TO COMPANY THAT YOU HAVE FULLY READ AND UNDERSTAND ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT AND AGREE TO ABIDE BY ALL SUCH TERMS AND CONDITIONS.**



CLICK "I ACCEPT" TO ACCEPT THIS AGREEMENT.

## MASTER MARKETING AGREEMENT

THIS MASTER MARKETING AGREEMENT ("Agreement") is made and entered into immediately upon acceptance of its terms and conditions by you ("Effective Date") and is between PROCON, INC. ("Company"), having a principal place of business at 2035 Lakeside Centre Way, Ste 125, Knoxville, TN 37922, and you ("Marketer").

1.  Authorization to Market. Subject to the terms and conditions of this Agreement, Company hereby authorizes Marketer, on a non-exclusive basis, to market those Company's products which Company in its sole and absolute discretion determines from time to time that Marketer may market ("Products"). Marketer acknowledges and agrees the terms of this Agreement apply to the sale and distribution of any other products Marketer may be, or may have been, authorized to distribute ("Other Products") by Company or any business to which Company is the successor ("Predecessor"), and that the terms of this Agreement supersede the terms of any prior or contemporaneous agreement between Company and/or Predecessor and Marketer relating to the marketing of Products or Other Products, whether made orally or in writing. Hereinafter, the term "Products" includes all Other Products.

2.  Terms of Sale of Products.

    (a)   Price. The price for each quantity of the Products purchased hereunder and other charges and fees payable in connection therewith shall be as set forth in Company's then existing price lists, and all such purchases shall be subject to the terms and conditions of sale set forth herein. Marketer shall also pay any and all other charges and fees set forth in any invoice of Company for the purchase of Products.

    (b)   Orders. Marketer shall transmit all orders to Company in written form specifying the quantity of each Product ordered and a requested shipment date, such date to be no less than thirty (30) days from the date of Marketer's order. Orders may be submitted to Company by facsimile or email addressed to PROCON, INC., Attention: Order Processing, (866) 655-8285 (for fax). All orders delivered by Marketer to the Company shall constitute only offers to purchase Products, and Company shall have the right to reject any order from Marketer and refuse to sell Products to Marketer at any time. THE TERMS AND CONDITIONS HEREIN SHALL GOVERN NOTWITHSTANDING ANY INCONSISTENT OR ADDITIONAL TERMS AND CONDITIONS OF ANY ORDER. MARKETER AGREES THAT ALL SUCH INCONSISTENT AND/OR ADDITIONAL TERMS AND/OR CONDITIONS OF ANY ORDER WILL BE DEEMED NULL AND VOID.

    (c)   Payment Terms. Marketer will receive an invoice with each shipment of Products setting forth the purchase price and other charges applicable to the Products being shipped. Unless such charges have been paid prior to shipment, Marketer will pay all charges set forth in the invoices C.O.D.; provided however, Company in its sole and absolute discretion may provide payment terms in the invoice. At Company's request, prior to the shipment of any Products to Marketer, Marketer will provide to Company a valid credit card number and the expiration date and other information requested by Company pertaining thereto, and Marketer hereby authorizes Company to bill to this credit card all charges for Products delivered which are not paid prior to their shipment or upon delivery. Upon cancellation or expiration of such credit card, Marketer will provide a new credit card number and expiration date and other information requested by Company pertaining thereto. If Marketer has not paid all sums due Company in accordance with the terms hereof, a monthly finance charge equal to the greater of (a) 1.5% per month, or (b) the


EXHIBIT
B

highest amount permitted by law, shall accrue and be payable each month until paid in full. Furthermore, upon Marketer's failure to make the payment in accordance with the terms hereof, a late fee equal to ten percent (10%) of the past due amount shall be due and payable by Marketer with respect to each such late payment. The waiver of a finance charge, late fee or any portion thereof shall not be deemed to be a waiver of any future finance charges or late fees. Marketer shall be liable to Company for any and all costs and expenses incurred by Company, including without limitation attorneys' fees and expenses, in collection of any past due amounts hereunder.   All taxes, imposes, duties, tariffs, or excises upon sale, use, transportation or consumption of the Products sold shall be borne by Marketer.  Marketer hereby grants to Company a continuing lien in such Products to secure Marketer's timely payment to Company for such Products in accordance with the terms and conditions hereof.

(d)      Delivery, Risk of Loss and Acceptance. Company will endeavor to meet delivery dates requested by Marketer. Company will, however, have no liability whatsoever for delays in delivery for any reason. Company expressly reserves the right, in the sole discretion of Company, to allocate shipments of products of Company, including Products, among all of the customers of Company. Products purchased by Marketer which are held for Marketer by Company shall be at Marketer's sole risk and expense. Deliveries to Marketer will be made FOB point of shipment to Marketer. All risk of loss passes from Company to Marketer upon delivery of Products to the carrier. Unless Company receives written notice of rejection from Marketer within 10 calendar days of Marketer's receipt of a shipment of Products, Marketer is deemed to have accepted such shipment of Products in whole as received.

(e)      No Return Policy. Subject to Section 2(d), Products purchased may not be later returned to Company.

3.      Company's Other Duties.  As long as this agreement remains in effect, Company agrees to: (a) use reasonable efforts to perform its obligations under this Agreement; and (b) provide reasonable sales support to Marketer, including training of Marketer on the proper sale and use of the Products.

4.      Marketer's Other Duties.  As long as this agreement remains in effect, Marketer agrees to: (a) use its best efforts to sell, market and promote Products and otherwise perform its obligations under this Agreement; (b) conduct its business in a businesslike, professional, and lawful manner, and in the best interests of Company; (c) comply with all Federal, State, international and local laws, rules and regulations applicable to the sale of Products, including without limit all import/export laws, rules and regulations; (d) provide Company with annual financial statements of Marketer to allow Company to assess its credit risks; (e) inform Company of all material matters relating to the sale and distribution of Products and/or Services, including any complaints or comments made relating to any of the Products and/or Services; (f) not make any warranty or guaranty, orally or in writing, concerning any of the Products or Services, which might be perceived by a customer as in any way binding Company, except for such warranties as are expressly authorized in writing by Company, nor make or provide any statement, representation or information concerning the Products or Services in addition to or inconsistent with any written statement, representation or information provided to Marketer by Company, including without limitation, the warranties, representations, disclaimers and other information contained in the Subscription Service Agreement; (g) not appoint any sub-distributor or independent sales agent of the Products and/or Services; (h) employ a trained and qualified sales staff to market the Products; (i) provide each and every End User with a copy of the product warranty; and (j) not provide any services similar to the Services or other services to be provided to End Users by Company under the Subscription Service Agreement.  As used in this Agreement, the term "Subscription Service Agreement" means the Subscription Service Agreement and Terms of Purchase accepted by the end user of each of the Products

("End User") through the Company Website (as defined below) pursuant to which Company agrees to provide the Services to the End User, and End User agrees to pay to Company the charges and fees applicable to the Products and Services. As used in this Agreement, the term "Services" means the provision by Company to End Users of location, operation and other information for a vehicle on which a Product is properly installed and is properly identified ("Monitored Vehicles") through the Company website ("Company Website"), and the ability to disable and enable the ignition system, to lock and unlock entry doors, and to send certain audible notifications to operators of the Monitored Vehicles by End Users using the Company Website and certain Company supported mobile devices.

5.     Marketer Services. Company, in its sole discretion, may provide Marketer with the ability to (1) create new user accounts so that an End User can use the Services associated with a Product, and (2) assign Products to an End User to complete the sale of Products to the End User (collectively "Marketer Services"). All Marketer Services are provided to Marketer through a Company maintained website that the Marketer accesses through the use of a user id and password created by the Marketer when the Marketer's account was created ("Marketer Portal"). Company may also provide Marketer with access to the Services for a Product that has been transferred to an End User through the Marketer Portal. You agree (1) not to use an End User's user account to access the Services, (2) not to create the password associated with an End User's user account, and (3) not to accept a Subscription Service Agreement on behalf of any person or entity other than Marketer.

6.     No Service Warranty. There is no warranty with respect to Marketer Services or Services, and Company makes no warranty under this Agreement except as specifically stated herein.    ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY SPECIFICALLY DISCLAIMED.    You assume all risk for loss of or damage to your Monitored Vehicle and its contents and for personal injury to persons occupying or affected by your Monitored Vehicle, and Company shall have no liability of any kind or nature to you therefor.    You agree that neither Company nor any other party has made any representations or warranties, nor have you relied on any representations or warranties, express or implied, including any implied warranty of merchantability or fitness for any particular purpose with respect to the Marketer Services or Services. You acknowledge that no affirmation of fact or statement (whether written or oral) made by Company, its representatives, or any other party outside of this Agreement with respect to the Marketer Services or Services shall be deemed to create any express or implied warranty on the part of Company or its representatives.

7.     Limitation, Exclusions & Disclaimers. You agree that the liability of Company, the Wireless Carrier (as defined below) and any third party CSC (as defined below) is limited in accordance with, and Company, the Wireless Carrier and any third party CSC may invoke, the provisions of this Section 7.

(a)     DISCLAIMER & LIMITATION OF LIABILITY RELATED TO GPS AND CELLULAR SERVICE - The Product receives signals from the Global Positioning Satellite ("GPS") system and transmits signals to, and receives signals from, a Company or a third party Customer Service Center ("CSC"). Services are provided either by a Company CSC or an independent CSC which Company selects. You understand that the Product installed in the Monitored Vehicle uses cellular telephone technology as the transmission mode for sending signals to the CSC. Services are available to you only within the United States only when the Product is within the operating range of the Wireless Carrier (as defined below). Services may be temporarily refused, interrupted, curtailed, limited or discontinued, without liability to Company or the Wireless Carrier, due to many conditions, including: (a) wireless transmission

capacity limitations and cellular telephone network capacity limitations, (b) atmospheric, terrain and geographic conditions, (c) other natural or artificial environment conditions beyond Company's control, (d) limitations of the electrical system design and architecture of your Product, (e) the condition of the Product (for example, the Product will not function if its power supply is not available as when, for example, the unit is not connected to a live power source, or if essential Product components are damaged (accidentally or otherwise), (f) government regulations or limitations, (g) restrictions by the Wireless Carrier (for example, wireless carrier equipment limitations and inter-carrier roaming agreements), (h) usage concentrations, modifications, upgrades, relocation and repairs of transmission facilities for the cellular telephone network, (i) Company's efforts to combat fraudulent use, and (j) other legitimate business and operational reasons. Global positioning capabilities used for some location-based services are not available if satellite signals are obstructed; you must be outside with a clear line of sight between you and the satellites. You understand that the Product's usage of the GPS system and the cellular telephone network are fundamental to Company's ability to provide Services. You understand that due to the very nature of cellular telephone, network and GPS technologies, there will be times when the Product is unable to secure, maintain, or transmit signals, or that the information transmitted is not reliable, and thus, Company will be unable to receive such signals. You also understand that Company does not receive signals when the transmission mode is or becomes non-operational and that signals from the Product cannot be received by Company when the Product is damaged, does not have an adequate power source or is otherwise non-operational. Accordingly, you agree that Company shall not, in any way, be liable for, or have responsibility with respect to, the GPS system, the cellular telephone network, any of the information obtained therefrom, or for interruptions in service for any reason whatsoever. You further acknowledge and agree that Company shall not have any liability for the interruption of services due to electrical storms, power failures, interruption or unavailability of telephone service, cellular and radio frequency or other conditions beyond Company's control, including, without limit, due to strikes, riots, floods, fires or acts of God. You acknowledge that the use of radio frequencies and cellular devices that the liability and obligations of Company to you under this Agreement for Services are strictly controlled and limited by the Federal Communications Commission ("FCC") and other governmental authorities which from time to time have jurisdiction and that changes in rules, regulations and policies may necessitate discontinuing such transmission devices by Company or the Wireless Carrier at Company's or the Wireless Carrier's option. In no event shall Company and/or the Wireless Carrier be liable for any cost, delay, failure or disruption of the Wireless Service (as defined below), lost profits, or incidental, special, punitive or consequential damages.

(b)     DISCLAIMER & LIMITATION OF LIABILITY RELATED TO PSAP or 911 SERVICE AND ANY THIRD PARTY CSC - In no event shall Company be liable for losses, damages, or claims arising out of your use or attempted use of a public service answering point ("PSAP") or 911 services or for your inability to access PSAP or 911 services. You understand and agree that you have no contractual relationship with any third party CSC and that you are not a third party beneficiary of any agreement between Company and any third party CSC. In addition, you expressly understand and agree that any third party CSC shall have no legal, equitable, or other liability of any kind to you, and you hereby waive any and all such claims or demands.

8.     PRIVACY DISCLOSURES AND COMPLIANCE WITH LAWS – YOU AGREE TO PROVIDE OR CAUSE TO BE PROVIDED ANY AND ALL DISCLOSURES TO EACH OWNER OR OPERATOR OF A MONITORED VEHICLE AND TO TAKE ANY AND

ALL SUCH OTHER ACTIONS AS MAY BE NECESSARY TO COMPLY WITH ALL LAWS (WHETHER STATUTORY, UNDER COMMON LAW OR OTHERWISE), RULES OR REGULATIONS APPLICABLE TO USE OF THE PRODUCT AND THE SERVICES AND THE INSTALLATION OF THE PRODUCT IN THE MONITORED VEHICLE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, YOU AGREE TO PROVIDE OR CAUSE TO BE PROVIDED FULL AND ADEQUATE ADVANCE WRITTEN DISCLOSURE TO EACH OWNER OR OPERATOR OF A MONITORED VEHICLE THAT THE PRODUCT IS INSTALLED IN SUCH VEHICLE. FURTHER, IF APPLICABLE YOU AGREE TO PROVIDE OR CAUSE TO BE PROVIDED FULL AND ADEQUATE ADVANCE WRITTEN DISCLOSURE (A) THAT COMPANY WILL BE PROVIDING THE SERVICES RESPECTING SUCH PRODUCT, AND (B) THE NATURE AND EXTENT OF THE SERVICES BEING PROVIDED BY COMPANY RESPECTING SUCH PRODUCT (e.g., THAT THE USER OF THE SERVICES IS ABLE TO DETERMINE THE PRECISE LOCATION OF THE MONITORED VEHICLE AT ANY TIME AND, IF APPLICABLE, HAS THE ABILITY TO LOCK THE DOORS OR DISABLE THE IGNITION SYSTEM OF THE MONITORED VEHICLE AT ANY TIME). NEITHER YOU NOR ANY OF YOUR EMPLOYEES, AGENTS, OR REPRESENTATIVES, DIRECTLY OR INDIRECTLY, WILL USE THE PRODUCT OR SERVICES FOR UNLAWFUL OR OTHERWISE IMPROPER PURPOSES, INCLUDING, WITHOUT LIMITATION, MONITORING THE LOCATION OF THE MONITORED VEHICLE OR DISABLING THE MONITORED VEHICLE FOR ANY PURPOSE OTHER THAN FOR A LEGITIMATE BUSINESS PURPOSE.

9.      Term Sheet. Company and Marketer may execute from time to time a separate written "Term Sheet" which specifically references this Agreement and states that it is entered into pursuant to this Agreement ("Term Sheet"). In the event Company and Marketer execute a Term Sheet, then the latest Term Sheet executed by Company and Marketer shall modify the provisions of this Agreement but only to the extent specifically stated in the Term Sheet. All other provisions of this Agreement not specifically modified by the Term Sheet shall remain in full force and effect. Failure by Marketer to meet any quotas specified in the Term Sheet shall constitute a breach of this Agreement.

10.     Installation. All products must be installed strictly as provided in the installation guide supplied with the Product. Marketer is responsible for obtaining the proper installation of the Products in the Monitored Vehicles in accordance with this Section. DISTRIBUTOR UNDERSTANDS AND AGREES THAT COMPANY IS NOT RESPONSIBLE FOR, SHALL HAVE NO OBLIGATIONS WITH RESPECT TO, AND SHALL HAVE NO LIABILITY TO ANYONE FOR, PRODUCTS NOT INSTALLED IN ACCORDANCE WITH THIS SECTION.

11.     Trade Marks and Trade Names. Marketer acknowledges that Company is the exclusive owner of all right, title and interest in and to the trade name "GOLDSTAR GPS" and all other trade names, trademarks, symbols and logos (collectively, the "Marks") used in connection with the Products and Services. Marketer shall in no way infringe upon, harm or contest the rights of Company in and to these Marks or any other intellectual property rights of Company. Any right that Marketer may obtain in the Marks, or any other intellectual property rights of Company, as a consequence of Marketer's use thereof shall inure to the benefit of Company. Marketer is granted the non-exclusive privilege of displaying the Marks in connection with the sale of the Products; provided, however, that Marketer shall discontinue the display or use of any such Mark, or change the manner in which such Mark is displayed or used, when requested to do so by Company. The Marks may only be used on or in connection with the Products

supplied by Company, in the form and manner specified by Company, or as otherwise approved by Company in writing in advance. Marketer may not use the Company name or any other Mark as part of Marketer's business name without the prior written consent of Company. Upon expiration or termination of this Agreement, Marketer shall immediately discontinue all use of the Marks, including, but not limited to, any and all use of such Marks on signs, stationary, advertising and other means of identification. Following expiration or termination of this Agreement, Marketer shall in no way represent that it is still a distributor of Company. Additionally, Marketer shall inform any retail customer who inquires about Products that it is no longer a distributor and shall refer each such customer to Company. Marketer shall promptly notify Company of any infringement of the Marks. Company may determine what action (if any) will be taken in respect of any infringement of the Marks. Marketer shall cooperate with Company in the prosecution of any infringement action. Marketer shall not copy or reproduce the Products or in any way infringe the Marks or enable, assist or cause others to do so. Marketer shall not re-package, alter, modify or re-label the Products without the prior written consent of Company.

12. <u>Private Label</u>. If Company has designated Marketer as a private label Marketer then:

(a) <u>Private Label</u>. Marketer intends to market and distribute all or a portion of the Products and Services in accordance with this Agreement under its own private label and using its own trade names, trademarks, service marks, symbols and logos (collectively, the "Private Label Marks"), and Company hereby authorizes Marketer so to do, provided, however, that the use of any and all such Private Label Marks and any repackaging and relabeling of the Products or Services shall be subject to the prior written approval of Company in its sole and absolute discretion. Marketer grants to Company a non-exclusive license to use any and all such Private Label Marks to the extent necessary for Company to perform its obligations under this Agreement as determined by Company in its sole and absolute discretion. In no event shall the "Private Label Marks" comprise or include any Company Marks or any marks that Company deems to be confusingly similar to the Company Marks.

(b) <u>Website</u>. Company may provide a website which is branded with the Private Label Marks ("Marketer Website") in connection with Marketer's marketing of the Products and Services and which contains a portal for access to the Company Website. Marketer acknowledges and agrees that all right, title, and interest in the Marketer Website is owned by Company and that Company may in its sole discretion modify any of the content of the Marketer Website. If Marketer desires to change the Marketer Website any such changes are subject to the approval of Company. Marketer agrees that the Marketer Website will require any users thereof to affirmatively agree to be bound by terms and conditions of use of the same form and substance as that applicable to the Company Website, including without limitation the Subscription Service Agreement, Terms of Use, Privacy Policy, Acceptable Use Policy, and copyright and trademark notices. Marketer agrees that nothing in this Agreement or in the marketing or distribution of Products and Services shall give Marketer any right, title or interest in or to copyrights held by Company in images or content associated with the Company Website. Marketer acknowledges and agrees that the Company Website and the terms and conditions of use applicable thereto shall contain such copyright notices deemed necessary to protect any right, title or interest in or to copyrights held by Company.

13. <u>Indemnification</u>. Marketer agrees to indemnify, defend and hold Company and its officers, directors, employees, agents and contractors harmless from any loss, cost, expense (including attorney's fees and expenses), demand, claim, liability, damages or cause of action of any kind or character (collectively referred to as "claim"), in any manner arising out of or relating to (i) any violation or breach of any provision of this Agreement; (ii) any acts or omissions of Marketer in the conduct of its business,

including, without limitation, the marketing and sale of the Products and Services; (iii) any statements, representations, warranties or other conduct by Marketer in connection with any transaction involving the Products and/or Services, other than that expressly provided to Marketer by Company or otherwise expressly authorized by Company in writing; (iv) the negligence, recklessness or intentional misconduct of Marketer or its officers, directors, employees, or agents; (v) the End Users' use of the Products and/or the Services, including, without limitation, the End Users' compliance with any and all laws (whether statutory, under common law or otherwise), rules or regulations applicable to the use of the Products or Services; (vi) the Marketer's use of the Services; (vii) the Marketer's use of the Services accessed through an End User's user account; (viii) any persons access to the Services through an End User's user account because the Marketer provided such person with the user id and/or password for the user account; and (ix) Company's refusal to provide Services to an End User because Marketer has not paid monies due to Company for Products or Services pursuant to this Agreement, or because the End User has not paid monies due to Company or Marketer for the Products or Services pursuant to the Subscription Service Agreement.

14.     Non-Competition.  During the Term of this Agreement, neither Marketer nor any of its principals or employees, whether directly or indirectly, will engage in, or have any ownership or financial interest in, or act as sales representative or distributor for, any person or entity engaged in, the sale of any products, services or product lines which are in any way similar in design, function or intended use (market position) to the Products or Services, or which otherwise are competitive with the Products or Services, in Company's sole and absolute judgment.

**15.     DISCLAIMER; LIMITATION OF LIABILITY.  COMPANY MAKES NO WARRANTY TO DISTRIBUTOR, WHETHER EXPRESSED OR IMPLIED, INCLUDING, WITHOUT LIMIT, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, BOTH OF WHICH ARE HEREBY EXPRESSLY DISCLAIMED. A PRODUCT WARRANTY IS ONLY AVAILABLE TO THE END USER AS SPECIFIED IN THE SUBSCRIPTION SERVICE AGREEMENT, AND DISTRIBUTOR DOES NOT RECEIVE A PRODUCT WARRANTY. THE TOTAL LIABILITY OF COMPANY WITH RESPECT TO ANY AND ALL CLAIMS, IRRESPECTIVE OF THE FORM OF ACTION, WHETHER IN CONTRACT, NEGLIGENCE, PRODUCT LIABILITY OR OTHERWISE, ARISING OUT OF OR INCIDENT TO THIS AGREEMENT OR USE OF ANY OF PRODUCTS, DISTRIBUTOR SERVICES, OR SERVICES SHALL NOT EXCEED THE PRICE PAID TO COMPANY ALLOCABLE TO THE SPECIFIC PRODUCTS ON WHICH SUCH CLAIM IS BASED. IN NO EVENT WILL COMPANY BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, INDIRECT, OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOSS OF PROFIT OR REVENUES, LOSS OF USE, LOSS OF DATA, COST OF CAPITAL, COST OF SUBSTITUTE GOODS, FACILITIES, SERVICES OR REPLACEMENT POWER, DOWNTIME COST, OR CLAIMS OF DISTRIBUTOR FOR SUCH DAMAGES, EVEN IF COMPANY KNEW OF OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. COMPANY SHALL HAVE NO LIABILITY WHATSOEVER TO DISTRIBUTOR FOR ANY CLAIMS OF PATENT, COPYRIGHT, OR OTHER INTELLECTUAL PROPERTY RIGHT INFRINGEMENT OR MISAPPROPRIATION OF TRADE SECRETS, MADE AGAINST DISTRIBUTOR INCIDENT TO THE PURCHASE OR USE OF PRODUCTS, DISTRIBUTOR SERVICES, OR SERVICES.**

16.     Changes in Products.  Company may discontinue selling any Product or Service or vary the selection of Products or Services available to Marketer or its customers upon 30 days prior written notice, or in the event of an emergency, without prior notice to Marketer.  Company shall have no liability to

reimburse Marketer for any damages or loss that Marketer may sustain by reason of any discontinuing or changing of any Product or Service pursuant to this Section.

17.     Background Investigations. Marketer hereby consents to the obtaining by Company of background, credit, and other investigations of Marketer and/or any employee or subcontractor of Marketer.

18.     Right to Prohibit Sale of Products or Services. Company reserves the right to prohibit the sale by Marketer of Products or Services to any entity or individual in its sole discretion and, in the event of such prohibition, Marketer agrees to refrain from selling any Products or Services to such entity or individual.

19.     Rights on Non Payment.     In the event Company has not received timely payment for Products or Services, or any other amount owed to Company by Marketer, Marketer agrees and acknowledges that Company reserves the right to (a) discontinue Services to End Users, (b) discontinue Marketer's access to the Marketer Portal, and (c) discontinue Marketer's access to Marketer's Services and Services. Marketer shall be liable to Company for any and all costs and expenses incurred by Company, including without limitation attorneys' fees and expenses, in collection of any amounts due hereunder.

20.     Insurance. Marketer hereby acknowledges that Company does not maintain comprehensive general liability, workman's compensation, or other insurance on behalf of Marketer. Marketer shall obtain and keep in force such insurance as Marketer determines to be prudent and appropriate to all risks associated with the marketing and sale of the sale of Products, including insurance covering damage to the inventory of Products in the possession of Marketer, and Marketer assumes all risk of the adequacy and sufficiency of any and all such insurance that Marketer so obtains.

21.     Term, Termination.

(a)     Term. The term ("Term") of this Agreement shall commence on the Effective Date and shall continue thereafter until terminated as specified herein.

(b)     Voluntary Termination.

(i)     Either Company or Marketer shall have the right and option to terminate this Agreement after not less than 60 calendar day's prior written notice to the other.

(ii)     Company may terminate this Agreement immediately upon (1) Marketer's failure to make any payment due under the Agreement, (2) a failure of Marketer to timely comply with Company policies, procedures, and instructions in effect from time to time, (3) the commission by Marketer of a breach of any of the terms and conditions in this Agreement, (4) the commission by Marketer of an act of gross misconduct, including fraud, forgery, theft, or any other act in violation of applicable laws, or of dishonesty, malfeasance, or willful misconduct, or (5) the occurrence of any act by Marketer in a manner harmful to the best business interests or reputation of Company.

(iii)     Marketer may terminate this Agreement if Company commits any material breach of this Agreement and fails to cure such breach within thirty (30) days following receipt of written notice from Marketer specifying the nature of such breach; provided that, if any breach is unable to be cured within such period of time, Marketer may not terminate this Agreement for such breach so long as Company has commenced efforts to

cure such breach within such period of time and is diligently pursuing the completion thereof.

(c)  Involuntary Termination.  Notwithstanding the provisions of Section 21(a), this Agreement shall terminate, and the Term shall expire, without notice to any party in the event of the insolvency, bankruptcy, liquidation, or filing of a petition seeking relief under the laws of insolvency or bankruptcy by or against Marketer.

(d)  Effective of Termination.  Upon termination of this Agreement, for cause or otherwise, Marketer shall cease to be an authorized distributor of the Products and Services, and:

(i)  All amounts and indebtedness owing by Marketer to Company shall, notwithstanding prior terms of sale, become immediately due and payable;

(ii)  All unshipped orders may be canceled by Company without liability of either party to the other;

(iii)  Marketer shall inform any retail customer who inquires about Products or Services that it is no longer a distributor of such Products or Services and shall refer each such customer to Company;

(iv)  Marketer shall promptly remove all signage and other references to Company and the Marks;

(v)  All Services that Marketer sold to End Users will continue to be provided by Company as long as such Services are timely paid in full, and such Services may be discontinued immediately upon nonpayment;

(vi)  Company has the right to bill and collect from End Users directly for Products and Services.

(e)  Option to Repurchase Products.  Upon termination of this Agreement by Company, Company shall have the option to re-purchase Products or any other items sold to Marketer pursuant to or as a result of this Agreement.  The purchase price for such Products or other items shall be the price originally paid by Marketer to Company.  If Company is required by law or pursuant to any re-purchase program that Company may institute to purchase any Products or other items pursuant to or as a result of this Agreement, then to the extent permitted by law, Company shall be required to purchase only those products that meet each of the following criteria:  (i) Marketer must have purchased the Products from Company and (ii) the Products must have never before been installed in a vehicle and be in good condition, re-saleable by Company without re-packaging or reconditioning.

(f)  Survival of Certain Obligations of Marketer.  Claims or disputes that arise at or prior to termination of this Agreement shall not be extinguished as a result of such termination and all provisions of this Agreement and any applicable Term Sheet will continue to apply to any such claim or dispute.  Further, the obligations of Sections 4, 5, 6, 7, 8, 10, 11, 13, 14, 15, 18, 19, 23, 27, 31, 32, 33 and 34 herein shall survive termination of this Agreement.  Except as provided in this Section, Company has no other obligation to Marketer of any kind or nature, whether pursuant to this Agreement or any Term Sheet, upon termination of this Agreement.

(g)     Injunctive Relief.  Marketer acknowledges a violation of Sections 11, 14, and 23 would cause immediate harm to Company and that damages for such harm would be difficult to calculate. Marketer agrees that Company may seek an injunction, temporary, permanent or otherwise, restraining order or such other equitable relief as may be available to prevent or restrain Marketer's breach of these Sections.

22.     Mutual Representations and Warranties.  Each party hereto represents and warrants to the other that:

(a)     Good Standing.  The parties hereto are entities duly incorporated or organized and validly existing and in good standing under the laws of the jurisdiction of their incorporation or organization and are duly qualified as foreign corporations or other entities to do business in every jurisdiction where their ownership or leasing of property or the conduct of their business requires such qualification and are in good standing in each of such jurisdictions.

(b)     Authority.  The parties hereto have the full right, power and authority to carry on their business as now conducted and to hold property and to enter into and perform their obligations under this Agreement.

(c)     Execution.  This Agreement has been duly authorized, executed and delivered by the parties hereto and assuming due authorization, execution and delivery by the other parties thereto, is in enforceable in accordance with its respective terms.

(d)     No Actions.  There are no actions, suits or proceedings pending, or to the parties' knowledge, after investigation, threatened against or affecting any of them in any court or before any governmental agency or instrumentality which if adversely determined would have a material adverse affect on the business operation or financial condition of any party hereto.

23.     Confidentiality.

(a)     "Confidential Information" means all information of every nature and kind, whether written, oral, on magnetic or other storage media, or in any other form of every nature and kind, including without limit: prospective and existing customer information of, plans, formulas, formulations, specifications, designs, prototypes, technology, samples, patents, copyrights, trade names, trademarks, business plans, sales methods, and present and future products and policies of, all as disclosed in any manner by Company.

(b)     Acknowledgement.  Marketer acknowledges and agrees that Confidential Information is proprietary to and a valuable trade secret of Company and that any disclosure or unauthorized use thereof will cause irreparable harm and loss to Company.

(c)     Obligations.  In consideration of the disclosure of Confidential Information, Marketer agrees to treat Confidential Information in confidence and to undertake the following additional obligations with respect thereto:

(i)     to use Confidential Information for the sole purpose of fulfilling its obligations under this Agreement;

(ii)    not to copy, in whole or in part, that Confidential Information specified by Company as not to be copied;

(iii)    to limit dissemination of Confidential Information to only those employees who have a need to know to perform the limited tasks set forth in this Agreement, and to prevent further dissemination and/or the use of Confidential Information by any employee or agent for any purpose other than that set forth in this Agreement; and

(iv)    to return Confidential Information, including all copies and records thereof, to Company upon receipt of request therefor, or a decision by either party to terminate this Agreement, whichever occurs first.

(d)    Non-circumvention.  In addition to the obligations above, Marketer expressly agrees that Marketer will not, directly or indirectly, reverse engineer, analyze or otherwise subject Confidential Information to any tests that would disclose the identity or makeup of the Confidential Information, nor shall Marketer permit others to reverse engineer, analyze or otherwise subject Confidential Information to any tests that would disclose the identity or makeup of the Confidential Information.   Marketer agrees Marketer will not, directly or indirectly, make for or sell (except as expressly authorized herein) to any third party any product that uses the Confidential Information.

24.    Independent Contractor Status. Marketer is and shall remain an independent contractor with Company in the performance of the terms and conditions hereof and in the performance of the obligations hereunder. Nothing contained herein is intended nor shall be construed to constitute Marketer as an employee, agent, partner, or joint venture of or with Company. Nothing contained in this Agreement is intended or shall be construed as constituting the exercise by Company of any degree of control or direction over the manner or method by which Marketer performs its obligations hereunder. As an independent contractor with Company, Marketer shall be solely responsible for all incidents of employment for himself or itself and any employee of Marketer, including without limitation any employee benefits, workman's compensation insurance, unemployment insurance, withholding and payment of federal and state income taxes and social security and Medicare taxes, and other legally required payments on sums received by Marketer from Company, or otherwise.  If any charges or taxes described in this Section are levied against Company for any reason, then Company shall be entitled to be immediately reimbursed by Marketer for any sums paid by Company in respect thereof.

25.    No Authority to Bind. Marketer shall have no right, power, or authority to bind Company to any term, condition, contract, obligation, or liability binding on Company to any party whatsoever. All costs, expenses, and liabilities incurred by Marketer in the performance of its obligations hereunder shall be an obligation solely of Marketer.

26.    Website. You acknowledge and agree that the information, Marketer Services, and Services provided by Company are accessed by you in part through the Marketer Portal.  You accept and agree to comply with the Terms of Use, Privacy Policy, Acceptable Use Policy, and copyright and trademark notices of Company posted on the Marketer Portal and in effect from time to time.  You acknowledge and agree that, because the Marketer Services and Services are provided in part through the Marketer Portal, it is necessary for you to have computer equipment and an internet connection that meets minimum specifications published by Company from time to time on the Marketer Portal, and you acknowledge and agree to periodically update your computer equipment and/or internet connection to meet such minimum specifications.  You acknowledge that the Marketer Services or Services may be interrupted due to (a) Marketer Portal downtime for scheduled maintenance at Company's sole discretion, or (b) interruptions in internet connectivity or other Marketer Portal downtime caused by circumstances beyond Company's control, including, without limitation, acts of God, acts of government, flood, fire, earthquakes, civil unrest, acts of terror, strikes or other labor problems, computer or telecommunications

failures, or delays involving hardware of software not within Company's control, network intrusions or denial of service attacks. You agree that Company shall not, in any way, be liable for, or have responsibility with respect to, any such interruptions.

27.     User Id and Password. During the registration process as a Marketer you created a user id and password that allows you to have access to the Marketer Services and Services through the Marketer Portal. You will not provide your user name or password to access Marketer Services or Services to any other person or entity, or allow any other person or entity to access Marketer Services or Services provided to you under your user name and password. You agree that you are solely responsible for any actions that occur under your user name and password. In the event that your user name and password becomes known by a third party you agree to notify Company immediately.

28.     Assignment. Company may assign the rights of Company hereunder without prior notice to Marketer and upon such assignment, Company shall be released from all liability hereunder. The provisions hereof are for the benefit of Company and Marketer and not for any other entity. Marketer may not delegate or assign any or all of Marketer's duties or rights hereunder without the prior written consent of Company, such consent to be granted or withheld in Company's sole and absolute discretion, and any such delegation or assignment shall be ineffective.

29.     Notices. Except as specifically provided in this Agreement, all notices required hereunder shall be in writing and shall be given by personal delivery, overnight courier service, first class mail postage prepaid, at the parties' respective addresses set forth herein, or at such other address(es) as shall be specified in writing by such party to the other party in accordance with the terms and conditions of this Section. All notices shall be deemed effective upon personal delivery, or one business day following deposit with any overnight courier service, or three business days following deposit with the U.S. Postal System, first class postage attached, in accordance with this Section. Notices for Marketer shall be sent to the address set forth for Marketer on the signature page. Notices for Company shall be sent to the address set forth for Company in the Preamble.

30.     Force Majeure. Company shall not be deemed in default hereof for delay, failure in performance, loss, or damage due to fire, strike, embargo, explosion, power irregularities or interruptions, earthquake, nuclear incident, volcanic action, flood, war, water, the elements, labor dispute, civil disturbances, governmental requirement, civil or military authority, acts of God or public enemy, inability to secure Products or transportation facilities, acts or omissions of common carriers, or other causes beyond the reasonable control of Company.

31.     Mediation/Arbitration.

        (a)     Except as provided in Section 21(g), in the event of any dispute, disagreement, claim, or any other cause of action of any kind or nature related to, under, or otherwise in connection with this Agreement, the parties hereto desire to avoid litigation. Accordingly, the aggrieved party will give notice of the dispute to the other party and both parties will attempt to settle the dispute during the thirty (30) day period following such notice. If such dispute remains unsettled, the parties agree to then submit such dispute to mediation. If the parties cannot agree on a mediator, each will select a mediator and the two chosen mediators will select a third mediator who shall alone hear the dispute. Such mediation will, if possible, be conducted during the sixty (60) day period following expiration of the thirty (30) day period. If such mediation fails to resolve the dispute, the parties agree such dispute will be submitted to final and binding arbitration in accordance with the rules of the American Arbitration Association. Unless otherwise directed by

the arbitrator, such arbitration must be concluded within ninety (90) days of the expiration of the sixty (60) day period previously specified for mediation. If the parties cannot agree on a single arbitrator, each will select an arbitrator, and the two chosen arbitrators will select a third arbitrator who shall alone decide the dispute. Any mediation or arbitration conducted hereunder will be conducted in Knoxville, Tennessee. The parties hereto shall equally share the costs of mediation (including the mediator's fees and expenses and costs directly related to the conduct of the mediation, but excluding each party's direct costs for transportation, attorneys, etc., for which each will be responsible). If any party fails to participate in mediation or arbitration after receipt of notice thereof, then each party hereto agrees that the other party shall have the right to proceed immediately to arbitration and that such other party shall be entitled to select the arbitrator in its sole discretion. Each party further agrees that, in such event, such arbitrator shall have the right to decide the dispute as if the non-participating party were participating in the arbitration and that such decision shall be final and binding upon each party hereto.

(b)     Attorney Fees and Other Arbitration Expenses. If any party hereto resorts to arbitration to remedy a breach of this Agreement, the prevailing party in the arbitration, in addition to any other remedies available under this Agreement or by law, may collect all or a portion of its reasonable attorney fees and other costs and expenses of arbitration at the discretion of the arbitrator, who shall consider both the reasonableness of the attorney fees and other costs and the relative merits of each party's position. It is the intent of all parties hereto to avoid arbitration without preventing a party from seeking redress for a valid dispute. To that end, all parties express their intent and agreement that unreasonable attorney fees and costs not be awarded, and that all or a portion of reasonable attorney fees and costs be awarded when in the arbitrator's opinion the party against whom such fees and costs are awarded has maintained position(s) which have significantly less merit compared to the prevailing party's position(s). Further, it is all parties intent that any party seeking redress through litigation, except as provided in Section 21(g), despite the fact that arbitration is required by this Agreement, shall not be entitled to recover any attorney fees or costs for such litigation or in any subsequent arbitration, regardless of the outcome of such litigation or subsequent arbitration.

32.     Venue. Except as specifically set forth in Section 21(g), it is the express intent of the parties that any dispute under this Agreement be decided in accordance with the mediation and arbitration provisions contained in Section 31 hereof. Notwithstanding the foregoing, in the event a court refuses to enforce the provisions contained in Section 31 for any dispute or, in the event a court is asked to decide a dispute concerning the provisions contained in Section 31, the parties expressly agree that jurisdiction and venue for actions under or pursuant to this Agreement shall be solely in any state court in Knox County, Tennessee, or the Federal District Court for the Eastern District of Tennessee, Northern Division, sitting in Knoxville, Tennessee.

33.     Subscription Service Agreements. Marketer acknowledges and agrees that all Subscription Service Agreements belong to Company. If a Subscription Service Agreement is entered into between Marketer and an End User, then Marketer hereby agrees to immediately assign each such Subscription Service Agreement to Company upon acceptance of the Subscription Service Agreement by the applicable End User, such assignment to be effected in such manner as Company shall require from time to time, and Marketer acknowledges and agrees that the assignment of each Subscription Service Agreement to Company shall be an additional condition precedent to the finality of the sale of the Product to which it pertains. Marketer hereby appoints Company as its attorney-in-fact to execute any and all documents and to perform any and all acts on behalf of Marketer as may be necessary in Company's sole and absolute judgment to effect the assignments of the Subscription Service Agreements to Company as required in this Section, such appointment being coupled with an interest and thus irrevocable. If for any

reason a Subscription Service Agreement between Marketer and an End User is not assigned to Company then Company will have no obligation to provide the Services to such End User and may discontinue the Services immediately.

34.    Miscellaneous. The terms and conditions hereof shall be governed by and construed in accordance with the laws of the State of Tennessee without resort to its conflicts of laws. The invalidity, in whole or in part, of any term or condition hereof shall not affect the validity of the remainder hereof. The failure of either Company or Marketer to enforce at any time any of the terms and conditions hereof shall not constitute or be construed to be a waiver of such terms and conditions or of the right of such party thereafter to enforce any such terms and conditions. You are solely responsible for complying with any orders, rules, and regulations of the Federal Communication Commission, or any other federal, state or local governmental authority, applicable to the purchase, installation, and operation of Products. Except as expressly provided herein, the terms and conditions hereof are for the benefit of Company and Marketer and no other party. This Agreement constitutes the final and entire agreement between Marketer and Company and supersedes any prior agreements, written or oral; provided that any Term Sheet between Marketer and Company is not superseded by this Agreement. Except for a Term Sheet, if any, there are no other agreements written or oral. Company has made no representation, warranty, or covenant not contained in this Agreement. Further, no amendment, modification, or waiver of, or supplement to, this Agreement shall be effective, unless it is in writing. Company may send Marketer written notification of any modification, amendment or supplement to this Agreement and Marketer will have sixty (60) days from the date of such written notification to object in writing to such modification, amendment or supplement, in which case Company will have the right to either immediately terminate this Agreement or allow this Agreement to continue without the proposed modification, amendment or supplement. Failure to object to any modification, amendment or supplement in writing will constitute Marketer's acceptance of such modification, amendment or supplement. The agreements made herein may not be modified, supplemented, or changed in whole or in part by any waiver (other than a written waiver signed by the party to be charged), oral representation, or course of dealing. The terms and conditions of this Agreement shall govern notwithstanding any inconsistent or additional terms and conditions of any other document submitted by Marketer. This Agreement may be executed in two (2) or more counterparts, each of which shall constitute an original, but together which shall constitute one and the same instrument. Each of the undersigned individuals for themselves represents and warrants that they have full power and authority to execute this Agreement on behalf of the party designated below for whom they sign.

**BY CLICKING "I ACCEPT" BELOW, YOU ARE REPRESENTING TO COMPANY THAT YOU HAVE FULLY READ AND UNDERSTAND ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT AND AGREEING TO ABIDE BY ALL SUCH TERMS AND CONDITIONS.**

| I Accept | | I Decline |
|----------|--|-----------|

**CLICK "I ACCEPT" TO ACCEPT THIS AGREEMENT.**