IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-21765-CIV-COOKE/BANDSTRA

National Auto Lenders, Inc.
a Florida corporation,

        Plaintiff,

vs.

Syslocate, Inc., a Delaware corporation,
DriveOK, Inc., a California corporation,
and Protect & Connect, Inc., a Tennessee
corporation, and as successor in interest
to Syslocate, Inc., and DriveOK, Inc.,

        Defendants.
_____/

**PLAINTIFF'S RESPONSE AND MEMORANDUM OPPOSING DEFENDANTS'
MOTION TO DISMISS AND/OR TRANSFER VENUE AND STAY
PROCEEDINGS TO COMPEL MEDIATION AND ARBITRATION [DE 24 and 27]**

Plaintiff, National Auto Lenders, Inc. ("NAL" or "Plaintiff") hereby files this response and memorandum in opposition to Defendants, Syslocate, Inc., DriveOK, Inc., and Procon, Inc. (collectively, "Defendants") Motion to Dismiss and/or Stay Proceedings and to Compel Mediation and Arbitration and to Transfer Venue ["the Motion", DE 24 and 27]. The Motion seeks to compel mediation/arbitration and or to transfer venue based entirely on terms stated in two agreements posted on Defendant Procon's website in May 2009 ("the May 2009 Agreements").

For the reasons explained below, the May 2009 Agreements, including and specifically their arbitration and venue provisions, are not enforceable because: (a) NAL never assented to their terms, and/or (b) an NAL employee clicked-through the May 2009 Agreements as a result of Procon's deception, trickery, and fraud; and/or (c) the May 2009 Agreements violate the

implied covenants of good faith and fair dealing to the extent Procon seeks to apply them applied to NAL's claims in this case; and/or (d) they constitute adhesion contracts which are procedurally unconscionable and should not be enforced because NAL users had no meaningful choice but to click to accept them or risk loss of $19 million in motor vehicle inventory. Therefore, Plaintiff requests that the Motion be denied in its entirety. In further support thereof, Plaintiff states as follows:

## FACTS AND BACKGROUND

NAL, located in Miami Lakes, Florida, provides indirect lending for car buyers by purchasing retail installment contracts ("Contracts") from retail car dealers. (Affidavit of Osvaldo Ramos ("Ramos Aff.") at ¶¶ 1, 22) NAL pays the dealers for the Contracts and then collects the payments from the customers. (*Id.*) The debt under each the Contract is secured by a lien on the vehicle. (*Id.*) NAL relies on the lien and right to repossess vehicles in the event of default in purchasing Contracts. (*Id.*) In order to protect its investment and minimize losses after defaults, it is essential for NAL to keep track, locate and recover them after default. (*Id.*)

NAL's claims in this case are for losses resulting from the failures of a majority of GPS tracking units marketed and sold to it by Defendants DriveOk and Syslocate (collectively "DOS") to function as intended. As alleged in the Complaint, the majority of DOS GPS tracking units purchased by NAL from DOS in 2007 and 2008 have failed (Ramos Aff. at ¶ 31). As a result, NAL has been unable to locate and track 235 vehicles, and has suffered other damages totaling well over $2,500,000 (*Id.*).

The defective units, which are the subject of NAL's claims, were purchased from DOS between March 2007 and April 2008 (Ramos Aff. at ¶ 6). During that period, DOS marketed and sold NAL more than 2,400 GPS tracking units for the purpose of enabling NAL to track and

2

locate vehicles securing its loans (Ramos Aff. at ¶ 28).  Access to a website maintained by DOS (the "Syslocate website") was, and is, required to track and locate DOS units (Ramos Aff. at ¶ 29).  Access to the Syslocate website, as well as the "locate" service performed through the website, was included in the purchase price (*Id.*).  Without access to the Syslocate website, the units cannot perform their intended purpose, i.e., tracking and locating vehicles (*Id.*).

Contrary to the statement in the Motion, NAL did not "contract with [DOS] for purchase of the [DOS] units via the website" (Motion at ¶ 3).  There has never been a formal written agreement between Plaintiff and DOS relating to the units other than a printed document which accompanied each batch of units shipped to NAL and was also provided electronically via email (Ramos Aff. at ¶¶ 32-33).  This document included installation instructions and a warranty (Ramos Aff. at ¶ 33).  It did not exclude any UCC warranties, or otherwise limit Defendants' liability for Plaintiff's claims in this case (*Id.*).  Importantly, it also contained no venue or arbitration provisions (*Id.*).

In April 2008, NAL stopped purchasing DOS tracking units due to their unreasonably high failure rates (Ramos Aff. at ¶ 30).  No DOS units have been purchased since that time (*Id.*).  However, the 2450 units previously purchased (the majority of which have failed), have and continue to be managed and tracked at the Syslocate website (*Id.*).

Prior to the DOS-Procon merger, and still to this day, NAL and its dealers have also purchased GPS tracking units from Procon (Ramos Aff. at ¶ 34).  The Procon units are "substantially different" from the defective DOS units, and are not the subject of the claims in this case (Ramos Aff. at ¶ 34).  Procon has two websites.[1]  NAL must access both websites in

---

[1] The Procon websites should not be confused with the Syslocate website, which operates separate and apart from the Procon websites.

3

order to track more than 1,900 vehicles with Procon units installed, the "Tracking" and "Distributor" websites described in the Wells Affidavit (Ramos Aff. at ¶¶ 35-38).

Mark Wells was President and CEO of DOS at the time NAL purchased the defective DOS units and is now Chief Technical Officer of Procon, according to his Affidavit (Affidavit of Mark Wells ("Wells Aff.") at ¶2). NAL's executives were communicating with Wells about the defective units before the merger, and, after the merger, with other Procon executives about the failures of the DOS units, in a good faith attempt to resolve NAL's claims for compensation for its losses for nearly a year before NAL filed this lawsuit (Affidavit of Asbel Perez ("Perez Aff.") at ¶ 6). Defendants initially cooperated in testing the units, and as of November 2, 2008, had acknowledged that 1,209 units were defective (Perez Aff. at ¶ 14).

While discussions to resolve NAL's complaints were ongoing, Syslocate attempted to trick NAL into releasing it from liability for NAL's claims regarding the defective units by posting a click-through end user license agreement ("EULA") on the Syslocate website and blocking access to that site unless NAL accepted the agreement. (Perez Aff. at ¶ 10) By blocking access to the Syslocate website, Syslocate was denying access to a service NAL had already purchased and paid for. (Perez Aff. at ¶ 10)

The EULA contained language that would have limited NAL's ability to recover the losses it suffered as a result of DOS' defective GPS units (*Id.*). The EULA also contained choice of forum and arbitration clauses (Ramos Aff ¶P49). Mr. Perez therefore advised the entire NAL staff to refrain from logging on to the Syslocate website (Perez Aff. at ¶ 11).

In addition, in an email to Mark Wells and other DOS representatives, NAL requested access to its accounts be turned off until an agreement could be reached, and notified DOS that "an acceptance of the EULA by an NAL user or subaccount user is not a valid acceptance by

4

National Auto Lenders as no user or subaccount user is authorized by NAL to accept the EULA in NAL's behalf" (Perez Aff. at ¶ 11). Shortly thereafter DOS removed the EULA from Syslocate website (Perez Aff. at ¶ 13).

As of November 2008, NAL executives Asbel Perez, Ozzie Ramos and Knox North were negotiating with and had communicated to Defendants' executives (including Mark Wells) that they were NAL's officers and decision makers, and solely authorized to enter into agreements on NAL's behalf (Perez Aff. at ¶ 16); (Ramos Aff. at ¶ 48).

NAL continued extensive testing protocols after DOS and Procon merged, but Defendants stopped cooperating in the testing, as the number of failed units continued to increase (Ramos Aff. at ¶ 51). On April 14, 2009, after NAL felt it had exhausted its efforts to reach an amicable resolution, undersigned counsel for NAL sent a demand letter to Defendants describing the extent of DOS unit failures, outlining the losses NAL had sustained and demanding payment for same (Ramos Aff. at ¶ 54). The demand letter is attached to the Affidavit of Osvaldo Ramos as Exhibit C ("Ramos Ex. C" or "Demand Letter"). In the Demand Letter, counsel stated, "All communications regarding this matter should be addressed to me, not to NAL" (Ramos Ex. C).

Four days later, on April 17, 2009, a "Subscription Service Agreement" appeared on *Procon's* website. NAL was unable to track vehicles with Procon units unless it accepted this agreement (Ramos Aff. at ¶ 56). On April 20th, undersigned counsel wrote to Defendants that the new agreement appeared intended to release NAL's claims involving the defective DOS GPS units, and, that NAL would not agree to, or execute, the agreement if Procon intended to use it against NAL in any manner in defense of the claims in this case (Ramos Aff. at ¶ 58). Counsel's letter is attached as Exhibit E to the Affidavit of Osvaldo Ramos. Also on April 20, 2009, Mr.

Perez sent an email to all NAL staff members advising them that no one was to "accept any new terms or conditions if asked" (Perez Aff. at ¶ 32).

Procon's Tennessee counsel, William "Rocky" McClamroch and John Wood contacted undersigned counsel in response to the April 20th letter. During telephone conversations that week, undersigned counsel for NAL advised them that NAL would not agree to the April Agreement to the extent that it would impact the claims in the demand letter. Procon's counsel informed undersigned counsel that Procon was requiring execution of the agreement to activate "new" Procon units, and that the Subscription Agreement would not apply to NAL's claims in this case. Undersigned counsel confirmed her understanding of our conversation in the following email sent to Procon's counsel on April 27, 2009:

> Dear Rocky:
>
> In our discussion last week, following the letter I sent to your client Syslocate/ProCon on April 20th (attached hereto) discussing what I refer to as the "New Agreement," you advised that your client is requiring execution of the New Agreement for activation of all new ProCon units.
>
> I advised you that my client National Auto Lenders will not execute the New Agreement if your client will try to use it to defend against my client's claims for the defective units described in my demand letter to your client dated April 14, 2009 (also attached). As the New Agreement states on its first page that its terms and conditions are applicable to the purchase and registration of the specific product being activated, during our conversation, I asked you to confirm with your client that it only applies to new Pro Con products being registered, and that your client will not try to use it for purposes of defending against my client's claims in the demand letter, so that my client can have that information in order to decide whether to continue purchasing products from ProCon.
>
> This will confirm your advice to me today that the "New Agreement" is not applicable to the defective units purchased by National Auto Lenders and described in my demand letter attached, and, that your client will not assert that the New Agreement or anything in it bars any of the claims described in the attached demand letter for the defective units.
>
> If the statement in the previous paragraph is not correct or agreed to by your client please notify me at once.

6

> At the present time, my client has had to hold up funding of several transactions due to its concern over the sudden appearance of the New Agreement on the activation website shortly after the demand letter was sent.

Notwithstanding Procon's agreement not to use the Subscription Agreement to defend against NAL's claims in this case, and its knowledge that NAL would not agree to any such agreement, Procon shortly thereafter posted the May 2009 Access Agreements relied on in support of this Motion (Ramos Aff. at ¶ 40-41). These agreements blocked access to websites needed to activate and/or track Procon GPS units in 1,900 vehicles, representing $19 million in assets, unless NAL clicked-through the agreements (*Id*.).

At that time, NAL understood that no agreement posted on the Procon website would be used to try to defend NAL's claims in this case regarding the defective DOS GPS units, because NAL had been so advised by Procon's counsel; because Procon's websites are not used to track Syslocate GPS units; and, because Procon was aware that NAL's officers and decision makers would not assent to the terms of any agreement which would impact NAL's claims in this case (Perez Aff. at ¶ 36). Nevertheless, NAL never lifted or retracted its instructions to its employees and staff members regarding the non-acceptance of any terms and conditions posted on the Procon websites (Perez Aff. at ¶ 37).

According to Wells' Affidavit, Procon uploaded the May Agreements containing the terms relied on in support of this Motion a few weeks after discussions between NAL and Procon counsel, in which it was communicated to Procon that NAL would not agree to any agreements which would impact its claims in this case (Ramos Aff. at ¶ 59-60). As a result of those communications, NAL had not asked Procon to block access to its account on the Procon website (Id).

No officer of NAL authorized to bind NAL to any contract clicked through or assented to the terms of these agreements (Ramos Aff. at ¶ 61). NAL cannot dispute that an NAL employee, consultant, or repo agent, clicked through these agreements at some point in order to access the Procon websites for purposes of tracking the 1,900 NAL vehicles with Procon units, representing $19 million in NAL assets (Perez Aff ¶38). However, such person had no authority to bind NAL to the terms relied on in the Motion, and NAL was unaware that any of its users had clicked-to-accept the May Agreements until it received this Motion (Ramos Aff. at ¶ 12, 63).

## ARGUMENT
### I.
**The arbitration/mediation and venue terms of the May 2009 Agreements relied on in the Motion are not enforceable because NAL never agreed to them.**

Defendants' request to transfer venue and to compel arbitration is based entirely on its arguments that NAL agreed to the May 2009 Access Agreements posted on the Procon website, in which mediation/ arbitration and venue provisions are deeply buried (page 8 of the Subscription Agreement, Ex 2 to the Motion ; page 19-20 of the Marketing Agreement, Ex 3 to the Motion). Defendant seeks to retroactively enforce these terms to NAL's claims in this case for the defective DOS units, sold long before these agreements were posted. These terms are not enforceable with respect to NAL's claims in this case because NAL's officers with sole authority to enter into them never assented to these terms.

**A**. **NAL did not assent or agree to the terms of the May 2009 agreements.**
Despite the strong federal policy in favor of arbitration, a Court will not compel parties to arbitrate a dispute where the parties have not agreed to do so, *Gedimex, S.A. v. Nidera, Inc*. 290 Fed. Appx. 311, 312, 2008 WL 3890259, 1 (11th Cir. 2008). In determining the propriety of a motion to compel arbitration, the Court is to engage in a two-step inquiry: (1) first, whether the parties agreed to arbitrate the dispute; and (2) second, whether "legal constraints external to the

8

parties' agreement foreclosed arbitration." *Id.* (quotations omitted). *Scott v. EFN Investments, LLC* 312 Fed. Appx. 254, 256, 2009 WL 368333, 2 (11th Cir. 2009) .

In order to form a binding contract there must be a common or mutual intention of the parties. Mutual assent is an absolute condition precedent to the formation of a contract. Absent mutual assent, neither the contract nor any of its terms come into existence. *Gibson v. Courtois,* 539 So.2d 459, 460 (Fla. 1989). *St. Joe Corp. v. McIver,* 875 So.2d 375, 381 (Fla.2004);  (For a contract to exist, the parties must reach agreement as to the meaning of each material term) *State v. Family Bank of Hallandale*  623 So.2d 474, 479-480 (Fla.1993) (Without a meeting of the minds on an essential element there can be no enforceable contract).

As set forth in the Affidavits of NAL's executives Ramos and Perez, only the officers of NAL were authorized to enter into agreements on its behalf.  Neither they, nor any other officer of NAL clicked to accept, assented to, or was even aware of the May 2009 Agreements and their provisions for mediation, arbitration, and venue in Tennessee, until they received Defendants' Motion to Dismiss. NAL's executives had informed Procon executives prior to the time it posted these Agreements they were NAL's owners, officer and decision makers and the only persons authorized to enter into agreements on its behalf (Perez Aff ¶15, 24).  In addition, weeks before the agreements were posted, NAL's counsel had advised Procon that all communications regarding NAL' claims in this case had to be made through her, not through NAL directly, and, that NAL would not agree to any terms of any Procon agreement that purported to impact NAL's claims in this case (Ramos Aff, ¶ 54-58).

None of NAL's officers clicked-to-accept the agreements, otherwise agreed to their terms, or would have assented to their terms to the extent that Defendants would attempt to use

9

them to defend NAL's claims in this case. Thus, there was no mutual assent to these agreements, and they may not be enforced to compel NAL to mediate, arbitrate or for purposes of venue.

**B. The click-to-accept the May 2009 Agreements by a non-officer NAL employee or user was ineffective to bind NAL because NAL had previously notified Procon that only its officers could enter any agreement, and, had instructed employees not to click to accept any terms on Procon's website.**

During NAL's November 2008 negotiations with DOS in trying to resolve the claims in this case, DOS attempted to trick NAL into releasing claims by posting an earlier click-to-accept agreement on the Syslocate website used to track DOS units. This agreement also contained arbitration and venue provisions (Perez Aff. ¶9-10; Ramos Aff. ¶49). At that time, NAL notified Mark Wells, formerly CEO of DOS, current Chief Technical Officer at Procon (and proponent of the May 2009 Agreements), that NAL would not agree to any of its terms, and, that "click to accept" on any such agreements by any "NAL user" was not valid acceptance by NAL:

> *This email also constitutes a formal notification that an acceptance of the EULA by an NAL user or subaccount user is not a valid acceptance by National Auto Lenders as no user or subaccount user is authorized by NAL to accept the EULA in NAL's behalf.*

(Perez Aff, ¶11 – 12).

In addition, on April 14, 2009, NAL's counsel advised Defendants that all communications regarding the claims in this case had to be directed to her (Ramos Aff. Ex C). On April 20th, 2009, she also advised Defendants that NAL would not agree to click through the Procon "click to accept" subscription agreement which had been posted on the Procon website at that time, to the extent it would be used against NAL with respect to its claims in this case (Id., Ex. E). At that time NAL also instructed all employers and users not to accept any new terms posted on the Procon website (Perez Aff. ¶32). In discussions with Procon's Tennessee counsel,

thereafter, he stated that the agreement then posted on the website would not apply to NAL's claims in this case, and confirmed this by his May 1st letter (Ramos Aff, Ex "F").

Therefore, NAL did not ask Procon to close access to its online account in May 2009, as it had in November, when DOS tried to trick it with the click-through on the Syslocate website. In that regard, closing NAL's account on the Procon websites would have deprived it of the ability to track, and thus put us at risk, millions of dollars of vehicles (Ramos Aff ¶59). Despite NAL's instructions to its employees and users not to click to accept any terms on the Procon site, evidently, an NAL employee, consultant or repo agent must have nevertheless clicked-through the May 2009 Access Agreements, in order to track vehicles with Procon units. However, this person had no authority to bind NAL to the terms of the Agreements (Ramos Aff. ¶61-63) .

To have an agent's actions bind his principal, those actions must be within the scope of his expressed or implied authority or be of such a nature that third parties would be entitled to rely upon those actions as being within his apparent authority." *Sumpolec v. Pruco Life Ins. Co*., 563 So. 2d 778, 779 (Fla. 3d DCA 1990). Because NAL had previously informed Procon that only its officers could enter into agreements and that only its attorney could communicate regarding the claims, and also, had instructed users not to click through the Procon agreements, click-through by NAL's user was not effective to bind NAL.

## II.

**In addition or alternatively, the terms of the May 2009 Agreements are not enforceable with respect to NAL's claims in this case because NAL did not turn off its Procon account, and its users were thus able to click-to-accept them, as a result of Procon's deception, trickery, fraud, and/or violation of the implied covenants of good faith and fair dealing.**

Every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties'

11

reasonable contractual expectations. *Cox v. CSX Intermodal, Inc.,* 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999). In posting the May 2009 agreement to the Procon website, and attempting to apply its terms retroactively to NAL's claims in this case, Procon has violated the covenant of good faith and fair dealing.

In addition to the DOS units which are the subject of this action, 1,900 Procon units, which are different from the DOS units, are installed in NAL vehicles. These vehicles represent, conservatively, $19 million in NAL assets (Ramos Aff. ¶20). As Procon knows, management and tracking of the 1,900 vehicles with Procon tracking units must be performed at the Procon websites, on which the agreements at issue were posted (Id. ¶36-41). More than 20 NAL employees and users have access to that site (Id. ¶ 42-43), and NAL had previously informed Defendants, through Wells, that none of its users had authority to bond it to such agreements (Perez Aff ¶12).

No service, tracking or any other function whatsoever is performed at the Procon website with respect to the DOS units which are the subject of the claims in this case. Management and tracking of the vehicles with the DOS units (of which 2,450 were purchased and 1,420 have failed) was from inception, and continues to be, performed only at the Syslocate website. Even after the DOS Procon merger, the Procon and Syslocate websites remain entirely separate and independent, although Procon now controls them both (Ramos Aff.. ¶44). Thus, it is not logical that Procon would try to modify the terms for the DOS units, managed solely through the Syslocate site, by posting agreements on the Procon site, applicable to Procon products, other than to the extent that Procon was attempting to trick NAL into accepting the agreements in order to use them against NAL in defense to its claims in this case.

In communications which occurred before the May 2009 Agreements had been posted, NAL had advised Mark Wells, and Procon officer, that only its officers could act for it (Perez Aff ¶15, 24), that it would not agree to the Syslocate Agreement posted on the Syslocate site in November (which limited its claims) (Perez Aff. ¶P11-12), or the Subscription Agreement posted on Procon's website on April 17, 2009, to the extent Procon would attempt to use it against NAL with respect to its claims in this case (Ramos Aff ¶56-59).  NAL thus believed that Procon would not thereafter make yet *another* attempt to trick NAL into limiting its claims in this case by use of a click-to-accept agreement on its website.

Therefore, in April, NAL did not ask Procon to close its accounts (Id. ¶64).  In that regard, Procon knew that NAL had 1,900 vehicles which it needed to track, for which it needed access to Procon website (Ramos Aff. ¶60).  With this knowledge, Procon thereafter changed and posted the May 2009 Agreements, attempting to make them retroactively apply to the claims in this case, and blocking access to both the "Tracking" and "Distributor" sites NAL needed to access to track its vehicles[2] absent an initial click-to-accept these agreements.

Evidently, an NAL user clicked on these agreements without the knowledge or authorization of NAL's management in order to track a Procon unit (Id. ¶63).  Under these facts, posting by Procon of the May 2009 agreements, blocking access to the sites absent an initial click to accept, and its use of them in this case in what is essentially a "gotcha" argument constituted fraud, trickery and demonstrates the antithesis of good faith and fair dealing.  For these reasons, this Court should find that the terms of the May 2009 Agreements have no applicability to NAL's claims in this case and deny Defendants' Motion.

---

[2] As explained in detail at ¶35-42 of the Ramos Affidavit, NAL must access both the Distributor and the Tracking website to track its vehicles.

## II

**In addition, to the extent Procon is attempting to retroactively apply the May 2009 Agreements to NAL's claims in this case, this constituted a defacto unilateral modification of the existing terms of the agreement with respect to the DOS units, for which there was neither valid consideration given, nor any valid commercial reason to justify same**

In 2007 and 2008, when NAL purchased and paid for the defective DOS units which are the subject of this action, there was no formal written agreement nor were there online terms of use in place. Rather, a written document came with the units containing a warranty, and access to the Syslocate website, which was required to track them, was included in their price (Ramos Aff ¶29, 32-33; Ex. A to Ramos Affidavit). The last DOS unit was purchased in March of 2008, long before the DOS-Procon merger (Ramos Aff. ¶46).

After the DOS units began to fail in large quantities, DOS had acknowledged that 1209 units (of 2450 purchased) had failed, and NAL had begun making demands for compensation, DOS attempted to trick NAL by posting an earlier terms of use agreement uploading terms of use on the Syslocate website at which the DOS units were managed, which would limit NAL's claims. NAL promptly responded and rejected the agreement (Perez Aff ¶9 – 15).

By inserting provisions in the May 2009 Agreements on the *Procon* website to make them retroactively apply to the *DOS* units managed at the *Syslocate* website and purchased and paid for more than a year before, Defendants are attempting to unilaterally and retroactively modify the existing agreement evidenced by NAL's purchase of the units and tracking service evidenced by the written document which accompanied their purchase, emails and other documents exchanged between NAL and DOS at that time (Ramos Aff ¶26-29, 33).

The unilateral modification of a contract is unenforceable." *Dows v. Nike, Inc*., 846 So. 2d 595, 603 (Fla. 4th DCA 2003), and any subsequent modification of a contract requires consent and a meeting of the minds of the parties to the contract whose rights or responsibilities

14

are sought to be affected by the modification." *Id;*. *Binninger v. Hutchinson*, 355 So. 2d 863, 865 (Fla. 1st DCA 1978) (quoting *Tropicana Pools, Inc. v. Boysen*, 296 So. 2d 104, 108 (Fla. 1st DCA 1974))(it is 'hornbook law' requiring no citations of authority except common sense, that a contract once entered into may not thereafter be unilaterally modified; subsequent modifications require consent and a 'meeting of the minds' of all of the initial parties to the contract whose rights or responsibilities are sought to be affected by the modification."  As demonstrated above, NAL did not agree to such modification.

Moreover, Procon's attempt to retroactively modify the agreement between NAL and DOS after NAL made demand for payment of its claims in this case was not in good faith, or done for any valid commercial reason.  The Uniform Commercial Code, which applies to the transaction between NAL and DOS as it involved the sale of the units, imposes an obligation of good faith upon all efforts to modify a contract.  Good faith in this context requires that a 'legitimate commercial reason' lead a party to seek the modification.  *T&S Brass and Bronze Works, Inc. v. Pic-Air, Inc.*, 790 F.2d 1098, 1105 (4th Cir. 1986) (affirming magistrate's finding that party acted in bad faith because it had no legitimate commercial reason for modifying the contract) (internal citations omitted) (citing *Weisberg v. Handy & Harmon*, 747 F.2d 416, 420 (7th Cir. 1984) ("precipitous change in market price"); *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 147 (6th Cir. 1983) ("unforeseen economic exigencies")).

Clearly, Procon, posted the May 2009 Access Agreement with terms purporting to retroactively apply to the DOS units, after NAL had made demands for compensation, in order to limit NAL's ability as to the manner and place in which it could pursue its claims in this case. This was not a valid commercial reason for such modification.  Therefore, the May 2009

Agreements are unenforceable with respect to NAL's claims in this case as unilateral modifications which were not made in good faith, nor for any valid commercial reason.

### IV.

**In addition or alternatively, the May 2009 Agreements are "adhesion contracts" which are procedurally unconscionable and should not be enforced because NAL users had no meaningful choice but to click to accept them, or put at risk $19 million in assets.**

As discussed above, and as Procon knows, NAL required (and continues to require) access to the Procon websites where the May 2009 Agreement was posted in order to track $19 million worth of vehicles and prevent their loss (Ramos Aff ¶ 41, 63). When Procon posted the May Access Agreements, it blocked access to these websites absent a "click to accept" by the first user who went to the website to track a vehicle thereafter (once one person clicked to accept, the screen would not appear for subsequent users) (Ramos Aff ¶63). Thus, the Agreements were posted in a "take it or leave it fashion," i.e., unless the user clicked to accept, he or she could not track $18 million worth of assets. The agreements are apparently "standardized forms."

An "adhesion contract" is defined in Black's Law Dictionary, Fifth Edition, as follows:

> Contract of adhesion. A standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract. [the] Distinctive feature of adhesion contract is that weaker party has no realistic choice as to its terms. *E.B. Harvey & Co., Inc. v. Protective Systems, Inc.*, 1989 WL 9546, at *3-4 (Tenn. Ct. App. Feb. 10, 1989).

In this case, blocking access to the Procon website portal for NAL absent a click to accept on the May 2009 Agreements gave NAL no realistic opportunity to bargain. NAL users either had to click to accept, or be denied access to tracking services for 1900 vehicles, (which service it had previously purchased without such conditions). Under these facts, the May 2009 Agreements posted by Procon are unconscionable adhesion contracts, and the arbitration and

16

venue terms (as well as any other terms which Procon might argue apply to NAL's claims in this case), are procedurally unenforceable.

## V.

**Venue should remain in the Southern District of Florida**

Defendants concede that "federal courts traditionally have accorded a plaintiff's choice of forum considerable deference…." (Motion to Dismiss at 9). Defendants contend that this deference should not apply to the instant case because of a purported agreement allegedly entered into between NAL and Defendants. For the reasons stated above, however, the purported agreement referenced by Defendants is not enforceable and, therefore, should have no bearing on the determination of proper venue.

"In a motion to transfer venue, the movant has the burden of persuading the trial court that the transfer is appropriate and should be granted." *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-60821-CIV, 2007 WL 3458987, at *3 (S.D. Fla. Nov. 14, 2007); *see also Stiefel Laboratories, Inc. v. Galderma Laboratories, Inc.*, 588 F. Supp. 2d 1336, 1338 (S.D. Fla. 2008) ("The burden is on the movant to establish that the suggested forum is more convenient."). "A plaintiff's choice of forum is accorded significant weight in determining the propriety of transfer." *Carrizosa*, 2007 WL 3458987, at *3. "The movant must therefore show that the balance of convenience strongly favors transfer in order to overcome the presumption in favor of plaintiff's choice of forum." *Id.* (internal quotation marks omitted).

Courts typically consider a series of factors when determining whether to transfer a case pursuant to § 1404. Those factors include,

> (1) the convenience of the witnesses; (2) the location of the relevant documents and the relative ease of access to the sources of proof; (3) the convenience of the

> parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and, (9) trial efficiency and the interests of justice, based on the totality of circumstances.

*Manuel v. Convergy's Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

In the instant case, NAL has chosen to bring this action in its home forum. Florida law applies to NAL's claims. The Southern District of Florida is likely to be more familiar with Florida law than the Eastern District of Tennessee. NAL's employees and consultants, including at least twenty people with access to the Procon website, are located in this district (Ramos Aff. at ¶ 70). The defective GPS units at issue in this case were marketed, purchased from, and shipped to this district (*Id.*). The defective GPS units were installed in Florida (*Id.*). The dealers who installed the defective GPS units are located in Florida (*Id.*). The automobiles that NAL has been unable to locate due to defective GPS units where lost in Florida (*Id.*). The efforts undertaken to locate the automobiles took place in Florida (*Id.*). The damages alleged in the Complaint were sustained in Florida (*Id.*). Finally, NAL has identified more than twenty-two non-expert potential witnesses with knowledge of the facts relating to NAL's claims in this case that reside in South Florida (*Id.*). Thus, NAL submits that venue is more convenient here.

Defendants' sole argument, independent of the purported agreement between the parties, is that litigation in the Southern District of Florida would be inconvenient (to Defendants only). Mere inconvenience, without more, should not outweigh the several factors that lean towards allowing NAL to bring this case in its home forum. Accordingly, the Court should deny Defendants' Motion to Transfer Venue.

## Conclusion

Contrary to Defendants' assertions in the Motion, Plaintiff has not agreed to arbitrate its claims based on the defective Syslocate units, or to venue anywhere other than the Southern District of Florida.  More specifically, Plaintiff has not agreed the terms of these agreements to the extent Defendants are attempting to use them in response to Plaintiff's claims in this case for the defective Syslocate units.  Plaintiff seriously values its right to a trial on its claims before this Court.  In numerous communications between the executives of Plaintiff, DriveOk, Syslocate, and Procon, Plaintiff's executives made clear to Defendants' executives, well before the agreements attached to the Motion to Dismiss or Transfer were even posted at the Procon website that it would not agree to any agreements which might limit or affect its claims in this case.  Nevertheless, Procon thereafter fraudulently posted the May 2009 Agreements attempting to retroactively apply them to NAL's claims. Under the circumstances, the agreements should not be enforced. For these and all other reasons set forth above, Plaintiff requests that Defendants' Motion be denied in its entirety.

Respectfully submitted, this 18th day of September, 2009.

> /s/  *Elizabeth M. Bohn*
> ELIZABETH M. BOHN
> JORDEN BURT LLP
> **Florida Bar No. 288047**
> 777 Brickell Avenue, Suite 500
> Miami, Florida 33131
> Telephone: 305-347-6814; Fax: 305-372-9928
> E-mail:  eb@jordenusa.com
> Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing Plaintiff's Response and Memorandum of Law Opposing Defendants' Motion to Dismiss and/or Transfer

Venue and Stay Proceedings to Compel Mediation and Arbitration was furnished on September 18, 2009 by the Court's CM/ECF electronic mail system to those parties registered to receive electronic notices of filings in this case.

/s/  *Elizabeth M. Bohn*
Elizabeth M. Bohn, Esq.
Florida Bar No. 288047

*180839*