IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-21765-CIV-COOKE/BANDSTRA

National Auto Lenders, Inc.
a Florida corporation,

        Plaintiff,
vs.

Syslocate, Inc., a Delaware corporation,
DriveOK, Inc., a California corporation,
and Protect & Connect, Inc., a Tennessee
corporation, and as successor in interest
to Syslocate, Inc., and DriveOK, Inc.,

        Defendants.
_____/

### AFFIDAVIT OF OSVALDO ("OZZIE") RAMOS

STATE OF FLORIDA      )
                                    )ss:
COUNTY OF MIAMI-DADE   )

      Before me, the undersigned authority duly authorized to take acknowledgments and administer oaths, this day personally appeared Osvaldo ("Ozzie") Ramos, after first being duly sworn under oath, deposes and says as follows:

      1.    My name is Osvaldo ("Ozzie") Ramos. I am President and CEO of National Auto Lenders, Inc., ("NAL") the Plaintiff in the above cause. I make this Affidavit from facts and matters personally known to me, and from the records of NAL maintained in the ordinary and regular course of business. NAL is a Florida corporation with offices in Miami Lakes. As such, its employees and records are in Miami-Dade County, Florida.

2. The other officers of NAL are Dania Ramos-Infante, CFO, Asbel Perez, Chief Marketing Officer, and William Knox North, Chief Technical Officer. Only NAL's officers, to-wit, Ms. Ramos-Infante, Mr. Perez, Mr. North and myself are authorized to execute agreements on behalf of NAL.

3. I make this Affidavit from my personal knowledge, and from the records of NAL maintained in the ordinary course of business, in opposition to Defendants' Motion to Dismiss and/or Transfer Venue and Stay Proceedings to Compel Mediation and Arbitration "Defendants' Motion."

4. Defendants' Motion is based on claims that on May 29 and June 1, 2009, respectively, NAL "clicked to accept," and therefore agreed to, the terms of "Subscription Service Agreement" and a Master Marketing Agreement" (collectively, "the May 2009 Access Agreements"), which Procon posted on its website in late May 2009.

5. According to the Affidavit of Mark Wells ("Wells"), Chief Technical Officer for Procon, in May 2009, Procon began requiring users of its "tracking" and "distributor" websites to "click to accept" the Subscription Service Agreement and "Master Marketing Agreement" prior to using Procon's tracking services, and "placing orders," respectively (Wells Affidavit ¶¶6, 12).

6. NAL's claims in this are for damages sustained due to the failure of over 1,400 GPS Tracking units sold to it by DriveOK/Syslocate ("DOS") in 2007 and 2008. Mark Wells was CEO of DOS at that time. Procon was not involved in the sale to NAL of the defective units which are the subject of this case.

7. NAL and the dealers whose contracts it purchases have also purchased GPS tracking units from Procon before DOS merged with Procon. Currently, 1,900 Procon units are installed in NAL vehicles, which units are not the subject of the claims in this case.

8. As explained below, in order to track and locate vehicles with Procon units, NAL dealers and employees and subcontractors must access both Procon websites at which the May 2009 Access Agreements were posted.

9. In order to track and locate vehicles in which the defective DOS units, which are the subject of this action, and others like them are installed, NAL must access an entirely separate website ('the Syslocate website"). Despite the merger between Procon and DOS, the separate Syslocate website remains active and is the only site at which vehicles with DOS units may be tracked.

10. As set forth in the Wells Affidavit, Procon posted the May Access Agreement, on the Procon websites, not the Syslocate website, which is used for the DOS units, and blocked access to these sites, absent an initial click-through on the May 2009 Access Agreements on which it relies in Defendants' Motion.

11. I never saw or had notice of either of the May 2009 Access Agreements until we received Defendants' Motion.

12. Neither I, nor any other officer of NAL had notice or knowledge that any agreement posted to Procon's website contained terms providing for arbitration, mediation, or venue in Tennessee, or that Defendants would attempt to apply terms of any agreement on Procon's website to NAL's claims for the defective DOS units, which were purchased long before the May 2009 Access Agreements were posted, until we received Defendants' Motion.

13. Neither I, nor any other officer of NAL with authority to bind it contractually ever "clicked to accept," or in any other manner assented to the terms of either of the May 2009 Access Agreements posted by Procon on its website.

14. Although NAL is unable to dispute that one of its employees or consultants may have clicked-through the May 2009 Access Agreements in order to track Procon units as described in more detail below, no such employee of consultant had authority to execute an agreement on behalf of NAL as communicated in writing as detailed in paragraph 50.

15. NAL has never assented to, did not agree to and does not agree to the arbitration, mediation, and venue provisions in the May 2009 Access Agreements which Procon asserts should apply to Plaintiff's claims in this case arising from its purchase of defective DOS units in 2007 and 2008.

16. In fact, as reflected by the long history of communications between NAL and Wells, and other representatives of DOS and Procon, described in detail below, which occurred prior to the posting of the May 2009 Access Agreements, Wells, and Defendants *knew* that neither I nor any other officer of NAL would assent or agree to terms of any agreement on the Procon website to the extent its terms would be used in any manner to defend NAL's claims in this case and its rights to have them tried by this Court.

17. Indeed, we believe that Procon's posting and attempt to use the May 2009 Access Agreements in defense of NAL's claims in this case was in bad faith, and, that click-through on the agreements by any NAL users was the result of deception and trickery. As explained in more detail below, the May 2009 Access Agreement were posted *after* :

(a) Wells, and after the Merger, Procon officers, had been in communications with NAL's officers about the claims in this case since at least August of 2008;

(b) Defendants had been expressly advised in writing, in November 2008, and in April 2009, that NAL would not agree to any click-through access agreement which would in any manner limit or affect its claims arising from the defective Syslocate units which are the subject of this case and which it purchased more than a year before the Agreements were posted;

(c) NAL informed Defendants and Defendants were advised and knew that the principals and sole decision makers and officers of NAL were its officers, including Dania Ramos-Infante, Knox North, Asbel Perez, and myself, that we had sole authority to enter into agreements for NAL, and that employees, consultants and other NAL users at Procon's website did not have authority to bind NAL;

(d) NAL's counsel informed Defendants, in writing, that all communications regarding the claims for the Syslocate units had to be made through counsel, and not through NAL;

(e) In April, after Procon posted an earlier version of the Subscription Agreement, NAL's counsel advised Procon, in writing, that NAL would not agree to this or any agreement posted on the Procon website to the extent such agreement would be used to defend NAL's claims in this case, and

(f) Defendants' counsel had indicated that agreements on the Procon website would not affect NAL's claims in this case.

18. NAL believes the May 2009 Access Agreements were posted on Procon's website after it led NAL to believe that agreements on the Procon website would not impact or be used in defense to its claims in this case for the defective DOS units, for the fraudulent purposes of inducing NAL to click on them and then using them in defense of NAL's claims in this case.

19. Furthermore, NAL received no consideration whatsoever for the May 2009 Access Agreements which Defendants are attempting to apply retroactively to the DOS units which were purchased in 2007 and 2008 and are the subject of its claims in this case. The log-on and website does not provide any service, access, or tracking for DOS units. To the contrary, the May 2009 Access Agreements are being used for the purpose of trying to deprive NAL of its rights to have those claims (which existed long before they were posted), tried by this Court.

20. In addition, Defendants know, and knew when they blocked access to the Procon websites by NAL employees absent clicking on the agreements, that NAL has 1,900 vehicles (approximately $19 million in assets) with Procon GPS units installed, which NAL must be able to track to avoid loss of those vehicles.

**Factual Background and History of NAL's Relationship with Defendants**

21. NAL provides indirect lending for car buyers by purchasing retail installment contracts ("Contracts") from retail car dealers ("NAL Dealers"). NAL pays the dealers for the Contracts and then collects the payments from the customers.

22. The debt under each Contract NAL purchases is secured by a lien on the vehicle. NAL relies on the lien and right to repossess vehicles in the event of default in purchasing Contracts. In order to protect its investment and minimize losses after defaults, it is essential for NAL to keep track of the vehicles, locate and recover them after default.

**NAL Purchases Syslocate GPS Tracking units in 2007 and 2008**

23.     In 2006, NAL was contacted by Garrett Jacoby ("Jacoby"), a DriveOK "master distributor," who represented that DriveOK could provide "high quality real time GPS vehicle tracking devices and services" for purposes of tracking, locating and recovering vehicles in Florida.

24.     Jacoby directed NAL to a website operated by DriveOk and Syslocate ("DOS") to market Syslocate brand GPS trackers. The website stated that Syslocate "was a leader in the industry" of providing GPS tracking units, that it had "helped companies to locate, track and recover their mobile assets" and that its GPS tracking system and tracking units offered "unique advantages with ease-of-use/install, functionality, and scalability not found in other commercial products."

25.     At NAL's request, Jacoby provided written information about DOS, biographies of their officers, including Mark Wells and Joel Hartley, President and Chief Technical Officer of DOS, respectively, and a company overview. The company overview stated:

> "DriveOk Inc. is in the business of *providing high-quality real-time GPS vehicle tracking devices and services.* Comprised of a very experienced management team from the wireless device industry (100+ years combined experience), *DriveOK is obtaining early recognition for exceptional service* and is posed for strong growth in vehicle monitoring and tracking...the origins of DriveOK are the result of the merger of already-partnered companies started in 2000 and 2003. The combination of one company's reliable, easy–to-use tracking services and the other company's innovative tracking devices has made for a *strong full-solution offering that is DriveOK...*" (Emphasis added.)

26.     DOS also provided a proposal describing its experience in wireless products and its tracking units and their use for vehicle recovery, and a Power Point presentation about the

GPS trackers which stated, inter alia, that the tracking unit products were reliable and had undergone *"extensive product testing."*

27. Finally, at NAL's request for this information, DOS represented to NAL that its tracking units had a failure rate of less than 1%. Wells was CEO of DOS at the time, and he was responsible for all representations made to NAL about the quality and reliability of the DOS products.

28. Based on the representations made by DOS as to the quality and reliability of the DOS tracking units, NAL decided to purchase DOS units to enable it to track, locate and recover vehicles. Between March 2007 and April, 2008, DOS sold NAL over two thousand (2,450) GPS tracking units, the vast majority of which were installed in vehicles securing NAL loans.

**Access to Syslocate Tracking Website required to track units and included in price**

29. The purchase price for the units included access to a website maintained by DOS www.syslocate.com ("the Syslocate website") used to track and locate the DOS units. In order to use the units for their intended purpose, i.e., to track and locate vehicles in which the units were installed, NAL has to log into the Syslocate website with the Syslocate provided user ID and password. Without access to the Syslocate website, tracking units cannot perform the intended purpose for which they were sold, i.e., tracking and locating vehicles.

**Failures of Syslocate Tracking units leading to this lawsuit**

30. In April, 2008, NAL stopped purchasing DOS units due to their unreasonably high rate of failure. No DOS units have been purchased since May, 2008. However, the 2,450 units purchased before then (of which the majority, but not all, have failed), have and continue to be managed (and vehicles tracked) at the Syslocate website.

31. As alleged in the Complaint, as a result of the failures of more than 1,400 (approximately 60%) of the DOS GPS units, Plaintiff has been unable to locate 235 vehicles, and has incurred extraordinary repossession and other costs, resulting in damages of well over $2,500,000.

**No Agreements limit NAL's claims with respect to the DOS Tracking units**

32. Before, during, and after purchase of the defective DOS GPS units, no formal written agreement or "terms of use" existed between NAL and DOS relating the DOS units or the Syslocate site.

33. A printed document which accompanied each batch of units shipped to NAL and was also provided electronically via email (Exhibit "A" hereto), which included installation instructions and a warranty, was the only written agreement with DOS relating to the units or use of the Syslocate site. That document does not exclude any UCC warranties, or otherwise limiting Defendants' liability for Plaintiff's claims in this case, nor does it contain venue or arbitration provisions. Plaintiff purchased and installed all of the defective DOS units which are the subject of this lawsuit accompanied only by this document. The agreement as to access to the Syslocate website included in the price was set forth in proposals and emails between NAL and Syslocate's distributor.

**NAL dealers purchase Procon units; NAL access to Procon Tracking Website**

34. Defendant Procon also manufactures and distributes a GPS tracking unit, which is substantially different from the DOS units. Beginning in 2008, dealers who sell Contracts to NAL began purchasing Procon tracking units. NAL also purchased some Procon units directly.

35. Procon knew that NAL Dealers were purchasing Procon units in order for NAL to track and locate vehicles securing Contracts sold to NAL. Procon also provided NAL with access to two Procon websites to manage and track the units installed in these vehicles.

36. The first, website "trak.GoldstarGPS.com" ("Goldstar"), is specifically used to track units. An alternative site, mobilesecurezone.com was previously used for tracking. When NAL logs into the Goldstar website, NAL may track and determine the location and status for all the units that are in its NAL account. The NAL account contains units purchased directly by NAL and typically has less than 100 units assigned to it. This is the website at which the May 2009 Access Agreement described in the Wells Affidavit as the "Subscription Service Agreement was posted.

37. The second Procon website, accessed at www.protectandconnect.com ("Distributor"), must be accessed to track units which are assigned to dealer accounts, i.e., units purchased by NAL Dealers. This is the website where the May 2009 Access Agreement described in the Wells Affidavit as "the Marketing Agreement" was posted. The Wells Affidavit fails to acknowledge that NAL must also access this website in order to track Procon units as explained below.

38. As Procon (and Wells) knows, when NAL wants to track a unit purchased by one of its Dealers, its users must first go to the "Distributor" site where the Marketing Agreement was posted. The user logs into this website, finds the unit, and clicks on the "TRAK" button. This ultimately leads back to the GoldStar ("tracking") website, but with special authentication that allows Dealer units to be tracked.

10

39. It is impossible for NAL to track Dealer units without going first to the Distributor site. NAL does not have Dealer passwords. There are over 1,800 Dealer units that have been or are being tracked using the Distributor website.

40. Dealers who purchase Procon units also rely on NAL to test the unit by tracking it using both Procon websites by the above procedure. NAL will not fund a loan until after the initial testing is successful. When the loan is funded, then NAL uses both Procon websites at which the May 2009 Access Agreements were posted to administer the account. This includes assigning the unit an account number so that the unit can be matched to the loan. Once the initial testing is complete NAL continues to track and monitor units over the life of the loan. Monitoring includes reviewing the history of tracking locates. Should the loan become delinquent, then additional tracking and administration is necessary.

41. More than 1,900 Procon units are currently installed in vehicles securing NAL loans. At a conservatively estimated average value of $10,000 per vehicle, these vehicles represent $19 million in assets. NAL must be able to manage, track and locate all of those units so that it can recover them after default and avoid losses of the vehicles. NAL employees and consultants must access both Procon websites for this purpose, the tracking website directly to track units purchased by NAL, and the distributor website, to track vehicles in the dealer accounts.

42. In that regard, more than 15 NAL employees use the Procon websites. None are Officers. None have legal training. None have authorization to commit NAL legally in any fashion. The employees belong to the following groups:

- Dealer relations and Underwriting: These employees track units to verify working operations prior to funding a dealer for purchase of a particular Contract.

- Collectors and Skip tracing: Employees and non-employees track units to determine locations of vehicles which may impact repossession decisions
- Repo Unit: This group tracks units to provide initial location information to repossession agents for Contracts in Default

43. In addition to direct NAL employees, at least five subcontractors have access: Ralph Long (according to the Wells Affidavit, an account with Long's name was used to click through an Agreement) provides Technical support and data analysis. Repossession agents also use the sites to have real time location information when attempting to repossess a vehicle.

**The websites used to track Procon and DOS units are entirely separate.**

44. Separate websites for Syslocate and Procon existed prior to the Syslocate-Procon merger in November, 2008. Since the Syslocate-Procon merger, the websites have not been combined or integrated in any way, although Procon now controls them both.

45. Managing, administering and tracking Syslocate units occurs only on the Syslocate website. Managing, administering, and tracking Procon units occurs only on the Procon websites. The Procon websites do not link to the Syslocate websites. The account and password for the Procon websites do not permit a user to access any Syslocate unit information.

46. The last Syslocate unit was purchased in March of 2008. No Syslocate units have been purchased since well before the Syslocate-Procon merger. It is and was my belief that agreements or terms of service on Procon's website would not apply to Syslocate units since no access, value, or service was provided to the Syslocate units from the Procon websites.

**Defendants' first attempt to trick NAL with a click-through agreement.**

47. Beginning in mid-2008, as the units continued to fail, NAL sought a resolution which would compensate the losses it was sustaining when it was unable to find its cars as a

result of the defective units, initially, from Syslocate and, later, after the merger in November, 2008 with Procon. Asbel Perez and I, as officers of NAL, negotiated with Syslocate's then President, Mark Wells, and after the merger, also with Procon's representative, Brian Boling.

48. As of November 2008, Mr. Perez, Mr. North, and I, had communicated to Syslocate's and Procon's officers, Mr. Wells and Mr. Boling that we were NAL's officers and decision makers on matters pertaining to contracts and agreements.

49. While these negotiations were ongoing (October-November 2008), DOS attempted to trick NAL into releasing it from liability for claims related to the defective units by posting a new click-through end user license agreement (EULA) on the Syslocate website which NAL had to access in order to track DOS units. The click-through agreement blocked access to the Syslocate website unless NAL accepted the agreement. The click-through agreement contained a clause releasing all claims against Syslocate/Procon, as well as choice of forum and arbitration clauses.

**NAL informed Mark Wells and other DOS representatives in November, 2008, that click-through acceptance of website agreements by its employees does not bind NAL**

50. NAL responded with an email to Mark Wells, Edwin Donahue, Bernard Arroyo and Guillaume Comeau (Exhibit "B" hereto) requesting that access to NAL's accounts to be turned off until an agreement is reached. That email also states, "This email also constitutes a formal notification that an acceptance of the EULA by an NAL user or subaccount user is not a valid acceptance by National Auto Lenders as no user or subaccount user is authorized by NAL to accept the EULA in NAL's behalf." Shortly after NAL's protest, the agreement was removed from the Syslocate website.

13

51. From late 2008 through 2009, DOS units continued to fail. NAL's consultant, Ralph Long, tested the GPS units with Bernard Arroyo and Guillaume Comeau of DOS and Procon, and in October 2008, Syslocate's consultants reported approximately 1,200 of NAL's entire fleet of DOS units had failed. Thereafter, Mark Wells suggested that we do another failure analysis of the units using the same consultants after year end. However, Defendants refused thereafter to cooperate with in further testing, and units continued to fail.

52. By March, 2009, the majority--one thousand four hundred and twenty (1,420)-- of the GPS units purchased by NAL, and installed on vehicles, had failed, proving that they were unfit for the purpose for which they were purchased. Of the 1,420 installed units that had already failed, 235 were installed on vehicles securing loans then in default. NAL was unable to locate these vehicles because the GPS units installed in these vehicles did not function properly.

53. As set forth in the Complaint, NAL lost the value of those 235 vehicles as a result. NAL's loss is estimated at approximately $2.3 million, based on an average of $10,000 per loan

**After NAL sent its demand letter to Defendants, Procon attempted to trick NAL into clicking on agreements, first in April and then, with the May 2009 Access Agreements, in order to use them for the fraudulent purpose of defending NAL's claims in this case for the defective DOS units**

54. On April 14, 2009, after continued efforts to reach a resolution, NAL's counsel sent a demand letter to Syslocate/Procon ("Demand Letter," Exhibit "C" hereto), describing the extent of DOS unit failures, outlining the losses NAL had sustained and demanding payment for same.

55. In the Demand Letter, NAL delegated its attorney as the point person for all communications regarding this dispute. Specifically, the Demand Letter stated, "All communications regarding this matter should be addressed to me, not to NAL."

56.     On April 17, 2009, four days after NAL's counsel sent the Demand Letter, an initial "Subscription Agreement" appeared on *Procon's* website ("the April Access Agreement"). NAL was unable to track vehicles with Procon units unless it accepted the April Access Agreement. A copy of that Agreement is attached as Exhibit "D."

57.     Although we did not believe the April Access Agreement, or any similar agreement on Procon's website for that matter, should relate to the claims in this case, we sent it to our counsel to whom we had delegated authority to communicate with Defendants about the claims in this case.

58.     After reviewing the Agreement, NAL's counsel sent the letter attached as Exhibit "E" to Defendants stating that NAL would not execute the agreement if Procon would try to use it against it NAL in any manner in defense of the claims in this case. We also issued written instructions to all of our employees and all NAL Email users, not to accept any new terms or conditions at the Procon website if asked to do so.

59.     Based on our counsel's letter to Procon, and correspondence from Procon's counsel sent in May (Exhibit "F"), we justifiably believed that neither the April Access Agreement, nor any similar agreement(s) posted thereafter on the Procon website, would affect our claims for the defective DOS units. Therefore, we did not, at this point in time, ask Procon to close access to our online account, as we had in November, when DOS tried to trick us with the click-through on the Syslocate website. In that regard, closing our access to the Procon website would have deprived us of the ability to track and thus put us at risk of the loss of millions of dollars of vehicles.

60. As set forth in the Affidavit of Mark Wells, less than a month later, Procon uploaded the May Access Agreements containing the terms relied on in support of Defendants' Motion. Procon knew at that time, that we had 1,900 vehicles which needed to be tracked at its website because it has information as to all units tracked on its sites.

61. While no officer of NAL authorized to bind it to any contract clicked-through or assented to the terms of these agreements, NAL is unable to dispute the statement in Well's Affidavit that someone, possibly an NAL employee, consultant, or repo agent, clicked-through these agreements using an NAL password in order to access these websites.

62. In that regard, access to NAL's account at the Procon tracking and Distributor websites was blocked unless the person attempting to access them clicked-through acceptance to the May 2009 Access Agreements.

63. Evidently, despite our April 20th instructions to our employees and users not to click to accept any terms on the Procon site, an NAL employee, consultant or repo agent must have nevertheless clicked-through the May 2009 Access Agreements, in order to track vehicles with Procon units. However, whatever person clicked–through these agreements had no authority to bind NAL to its terms. And once that person logged-in and clicked-through once, other employees would not have seen the terms on log-ins thereafter. As a result, no one else saw the screen and reported it to management.

64. NAL's management had not asked Procon to close access to its online account because it believed that no agreements on the Procon website would be used against NAL in regard to its claims in this case, based on the fact that NAL's counsel had previously sent a demand letter to Procon requiring all communications regarding the claims in this case be made

through her, that counsel had notified Procon in writing that it would not agree to any agreement limiting its claim in this case, and that Procon's counsel had responded with a letter indicating to us that agreements on Procon's website would not affect NAL's claims for the defective DOS units, and had informed DOS in writing that no user had authority to make agreements on NAL's behalf.

**Defendants' reliance on the May 2009 Access Agreements is not in good faith, as Defendants' fraudulently posted and is attempting to use them against NAL with full knowledge that NAL would not agree to terms of any agreement on the Procon website which would impact its claims in this case, and that NAL employees could not bind NAL to such agreements.**

65.     Unless NAL employees, consultants, and agents could access the Procon websites, NAL could not activate, and/or track 1,900 vehicles (approximately $19 million in vehicles) in which Procon GPS units are installed and active. Procon knew this, and that it was vital to NAL's financial interests to have access to both its websites to do so.

66.     As demonstrated when the first agreement was placed on the Syslocate website, and then removed after NAL protested, Procon had and has the capability not to post agreements to the sites used by specific users.

67.     By blocking access to websites used to activate and/or track Procon GPS units in 1,900 vehicles absent clicking-through the May 2009 Access Agreements, which Procon knew many NAL employees and consultants used to track vehicles, Procon used deception and trickery to try to trick NAL, through it employees, who had no understanding of their terms, to click-through them in an attempt to bind NAL to terms to which it knew NAL management would never agree, in order to use those terms against NAL in this case, after leading NAL to believe that agreements on the Procon website would not apply to these claims. It also did so despite

having been expressly informed in Exhibit "B" hereto that no NAL website user was authorized to accept any terms or EULA.

68.     NAL does not and has never agreed to mediation or arbitration of its claims in this case, or to venue in Tennessee.

**NAL received nothing of value for the May 2009 Access Agreements**

69.     NAL received nothing of value for the May 2009 Access Agreements, especially to the extent they attempt to retroactively apply to the DOS units. Neither of the Procon logon accounts which had the May 2009 Access Agreements provide any value, access, or service for any DOS units.

**Venue should remain in the Southern District of Florida**

70.     NAL believes that trial before this Court is more appropriate and convenient. NAL and all of its employees and consultants, including at least 20 people with access to the Procon website, are here. DOS marketing efforts took place here. The defective units were shipped and installed here. The Dealers who installed them are here. The cars which were lost were here. Efforts to locate them took place here. NAL has identified more than 22 non-expert witnesses in the South Florida area with knowledge of facts relating to its claims in this case, and whom it may call as witnesses. Finally, the damages were sustained here .

FURTHER AFFIANT SAYETH NAUGHT.

_____
OZZIE RAMOS

The foregoing instrument was acknowledged before me this 17TH day of SEPTEMBER, 2009, by OZZIE RAMOS.  Such person: *(notary must check applicable box)*

- ☑ is/are personally known to me.
- ☐ produced a current Florida driver's license as identification.
- ☐ produced _____ as identification.

_____
NOTARY PUBLIC
State of Florida
My Commission Expires:



CARLOS A. SANCHEZ, JR.
Comm# DD0763131
Expires 2/27/2012
Florida Notary Assn., Inc

*180806-v1*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing Affidavit of Osvald ("Ozzie") Ramos in support of Plaintiff's Response to Defendants' Motion to Dismiss and/or Transfer Venue and Stay Proceedings to Compel Mediation and Arbitration was furnished on September 18, 2009 by the Court's CM/ECF electronic mail system to those parties registered to receive electronic notices of filings in this case.

/s/ *Elizabeth M. Bohn*
Elizabeth M. Bohn, Esq.
Florida Bar No. 288047