IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-21765-CIV-COOKE/BANDSTRA

National Auto Lenders, Inc.
a Florida corporation,

        Plaintiff,

vs.

Syslocate, Inc., a Delaware corporation,
DriveOK, Inc., a California corporation,
and Protect & Connect, Inc., a Tennessee
corporation, and as successor in interest
to Syslocate, Inc., and DriveOK, Inc.,

        Defendants.
_____/

## AFFIDAVIT OF ASBEL PEREZ

STATE OF FLORIDA     )
                                   )ss:
COUNTY OF MIAMI-DADE   )

      Before me, the undersigned authority duly authorized to take acknowledgments and administer oaths, this day personally appeared Asbel Perez, after first being duly sworn under oath, deposes and says as follows:

      1.     My name is Asbel Perez. I am Chief Marketing Officer of National Auto Lenders, Inc., ("NAL") the Plaintiff in the above cause. I make this Affidavit from facts and matters personally known to me, and from the records of NAL maintained in the ordinary and regular course of business.

      2.     I have read the Affidavit of Osvaldo ("Ozzie") Ramos, President of NAL. I agree and adopt all of the statements contained in it as if my own.

3. Between March 2007, and April, 2008, NAL purchased more than 2,400 GPS Tracking Units from DriveOK/Syslocate ("DOS")

4. As of July, 2008, NAL had determined, through testing and other analysis, that 561 of the DOS tracking units were not working.

5. As customers with vehicles in which the defective units were installed began to default, NAL was unable to locate the vehicles and began to suffering financial losses caused by loss of the vehicles, as well as incurring extraordinary expenses in attempting to recover vehicles with non-working units.

6. As a result, beginning on August 15, 2008, and continuing thereafter, I began to communicate with Mark Wells, President of Syslocate, and after Syslocate merged with Procon, with Brian Boling and Ben Parker of Procon, demanding compensation for the losses we were incurring as a result of the failed DOS units. These losses included extra costs incurred by NAL in attempting to locate vehicles with defective units, and began to include the value of lost vehicles as well.

7. Between October and November, 2008, Ozzie Ramos and I continued to try to reach an agreement with Mark Wells for compensation for the ever-increasing losses it was incurring and would continue to incur as a result of the defective units. During that period, Ozzie Ramos and I informed Mark Wells that the only agreement that existed was the warranty agreement attached to Mr. Ramos' Affidavit. We indicated that we had it reviewed by our attorneys and that the warranty had no limitations.

8. As stated in the Affidavit of Ozzie Ramos, access to the Syslocate website was required to track and locate Syslocate units, and was included in their purchase price. Since the beginning of our relationship with Syslocate and throughout the time we purchased Syslocate

units, there had never been a click-through click-wrap end user license agreement (EULA) on the Syslocate website.

9. In early November, 2008, during our attempts to negotiate an acceptable resolution of the issues, and while early drafts of a proposed settlement agreement were going back and forth between us and Mr. Wells, a click-wrap end user license agreement (EULA) containing a release on the website which had to be accessed to activate and track units. The new EULA was posted on the website approximately one week after Mr. Ramos and I advised Mark Wells that the Syslocate warranty had no limitations. This EULA was brought to our attention by an employee who was attempting to track vehicles.

10. By posting the EULA to their tracking/access website, Syslocate was denying access to all services NAL had already paid for, unless NAL agreed to the new terms. These included a new limited warranty and other language which would have limited NAL's right to recover for the losses it had and would continue to sustain as a result of the defective Syslocate GPS tracking units which are the subject of this case.

11. It appeared that Syslocate was thus attempting to trick NAL into releasing it from liability it otherwise had for the claims which we had been discussing by phone and email for several weeks. NAL immediately refused, and I formally advised the entire NAL staff via email not to log on to the Syslocate website by the following email:

> Tuesday 11/4/2008 9:22 AM
> From Asbel Perez to All NAL EMAILS:
> TEAM,
> PLEASE DO NOT "SIGN IN" TO SYSLOCATE FOR ANY CIRCUMSTANCE UNTIL FURTHER NOTICE.
> If anyone has any additional questions please direct your question directly to Ozzie or myself.
> Thank you
> Asbel

12. In addition, and at my direction, NAL technical consultant, Ralph Long, sent the email below to Syslocate: (a) requesting all online access to their website turned off, since we were unwilling to agree to the new End User License Agreement, and, (b) *notifying them that the acceptance of the EULA by any NAL user or subaccount user was not a valid acceptance by NAL as no user or subaccount user was authorized by NAL to accept the EULA in NAL's behalf:*

Sent Tuesday 11/4/2008 9:58 AM VIA EMAIL:

FROM: Ralph Long to: 'info@syslocate.com'; 'mark@driveok.com'; 'edwin donahue' 'Bernard Arroyo'; Asbel Perez; 'Guillaume Comeau'Johanna Ley; Carlo Partipilo; Ozzie Ramos; Knox North

We need all account access to the National Auto Lenders (NAL) on-line account and all sub-accounts turned off immediately!

Our account log in name is syslocate@nalenders.com.

NAL finds that it is unable to agree to the new End User License Agreement. In order to ensure that none of our system users (including our subaccount holders) incorrectly accepts the End User License Agreement, we need to stop their access to the account. A password change for the account and subaccounts will do but do not provide us the new passwords. Do not send the new passwords to the account log in password as that mail goes to multiple people. If and/or when the EULA is no longer required or we can reach an agreement, then we can reactivate access to the on-line account. *This email also constitutes a formal notification that an acceptance of the EULA by an NAL user or subaccount user is not a valid acceptance by National Auto Lenders as no user or subaccount user is authorized by NAL to accept the EULA in NAL's behalf.*

Until then we (National Auto Lenders) expect that all of our locate and other needs for products already purchased by NAL and its dealers will be handled by phone calls to SysLocate Customer Service without reference to the need for an EULA which was not in place at the time of purchase. We also expect that SysLocate (and its distributors) will cease selling new units and services to NAL and its dealers pending a resolution to the current issue. (Emphasis added)

Regards,
Ralph Long

4

13.     Within hours, Bernard Arroyo, at that time a Syslocate representative, sent us contact information for Ben Parker, VP Customer Relationship Manager to discuss the EULA issue. A few hours later, Mr. Arroyo advised NAL that the agreement had been taken off the Syslocate web access.

14.     By early October, 2008, failures of 1,209 DOS units sold to NAL had been confirmed by Syslocate as per the following email to Mark Wells from Syslocate consultant, Guillaume Comeau on October 2d.:

> From: gcomeau@hotmail.com
> To: mark@driveok.com
> Subject: RE: Summary of joint NAL/SysLocate GPS population failure analysis
> Date: Thu, 2 Oct 2008 11:37:16 -0400
>
> Hi Mark,
>
> Here is where Rocky and I hand it off to Asbel and you.
> My recommendation:
> - Group for which we should offer compensation now: D, 92% of G. The percentage reflects an extrapolation based on the probability of a G unit fails and is not disconnected.
> - Group for which we should not: A, B, E, F, H
> The definition of what is a failed unit will determine whether we should compensate for group C given that a late failure is more expensive than an immediate failure.
> - If we compensate for units failing in the field, group C should be excluded.
> - If we compensate for DOA units, group C should be included.
> I do not know where you and Asbel set the bar.
> Total count:
> 888+ .92*247= 1116 units without group C
> +93 = 1209 units including group C

15.     In early November, 2008, Mark Wells suddenly became unreachable, failing to return my emails and calls to discuss resolution of NAL's losses caused by the defective Syslocate units. Around the same time (November, 2008), Procon and Syslocate announced

5

their merger with Procon, and Procon also became directly involved in the discussions. After the merger, Brian Boling and Ben Parker of Procon became involved in the negotiations.

16. During discussions and negotiations with Wells, Boling and Parker in late 2008, Ozzie Ramos and I communicated to them that we and Knox North were NAL's owners, officers, and decision makers, and the only representatives authorized to enter into any agreements on its behalf.

17. After the merger, I advised Procon CEO, Brian Boling, ("Boling") that we believed Mark Wells was not negotiating in good faith, and again, requested a proposal for a complete resolution, including payment for the lost vehicles, the value of which by now exceeded $1 million. I also informed him of how Syslocate attempted to trick us with a mandatory website log-in acceptance to new terms and conditions. Furthermore, Mr. Ramos and I advised Mr. Boling that Mark Wells had suggested that both companies (NAL and Syslocate) jointly verify the number of failed units again at the beginning of the year to prove that additional units were not failing.

18. During a conference call with Boling and Mark Wells in December 2008, Boling told Wells "let's stop wasting time and get this resolved right away." Boling seemed surprised to hear the magnitude of the problem, and agreed to resolve the issue as well.

19. Instead of doing so, in December 2008, Mark Wells made the same offer, i.e., replacement of the defective units and a small payment, which he had previously proposed and which we had previously rejected. Defendants also refused to cooperate in further testing of the units thereafter.

20. Between November, 2008, and March, 2009:

    (a)    Syslocate units continued to fail;

  (b)  additional vehicles were lost;

  (c)  NAL attempted to locate lost units;

  (d)  Procon and NAL continued to conduct failure analyses; and

  (e)  Procon continued to fail to offer a solution other than to offer to replace defective GPS tracking units.

  21. As Syslocate had done since October, 2008, through March of 2009, Procon continued to offer replacing defective units as a resolution of the issues, even though it never provided a feasible method to do so. Although Mark Wells claimed that they had obtained "great results" on the West Coast with some customers that had similar problems, he never provided the details of the program, nor the names of any of the companies he claimed to have successfully implemented an exchange campaign or any details of the process, despite his promises to do so.

  22. I advised Boling, as I had advised Mark Wells, that replacing defective tracking units already installed in vehicles was not feasible as it required cooperation of third parties, i.e., dealers and the borrower customers, whom NAL did not control. NAL also had no facilities capable of installing replacement units, and no ability to require dealers to do so.

  23. In addition, and more importantly, even if the dealers would agree to install replacement units, neither NAL nor the dealers it purchased the contracts from could compel borrowers whose vehicles had defective tracking units, many of whose loans were in default, to bring them into a dealer for replacement of the units. Many of the borrowers and the vehicles could not be located (the reason for purchasing the tracking units in the first place), and we had good reason to believe that telling borrowers that the GPS tracking units on their cars intended to

facilitate repossession on default were not working, would do nothing more than increase the risk of default and add to our losses.

24.   When I explained to Wells and Procon executives that NAL could not require borrower/customers to bring their vehicles to dealers for installation of replacement units, they suggested tricking Contract borrowers to come into the dealers with an offer of a free oil change, and then changing out the defective GPS tracking units without telling the borrowers. I advised them that this was unacceptable as NAL would not participate in lying to or defrauding the borrowers.

25.   As of early 2009, Mr. Ramos, Mr. North, and I, had all been in direct communication to Syslocate and Procon officers Wells, Boling and Ben Parker, and they had been advised that the three of us were NAL's officers and decision makers.

26.   On March 25, 2009, I sent the following email to Messrs. Wells, Parker and Boling in response to their repeated offer to replace defective units:

> Ben, Mark, and Brian,
>
> This is in response to your March 23rd email.
>
> For more than six months, we have been requesting a proposal from you for a complete solution which would adequately address the losses our company has and will continue to sustain as a result of the defective devices provided by Syslocate.
>
> The "recovery and exchange service program" suggested in your March 23rd email is a regurgitation of a suggestion which has been made and rejected for several months.
>
> It is inadequate for reasons we have explained previously, i.e., it does not even begin to provide a complete solution for the losses we have and will continue to sustain and as a result of the installation of Syslocate's defective product. Back in November, we advised Mark that 100 vehicles were missing, that the average loss was $11,000 per vehicle and that we needed a proposal which would include reimbursement of our losses. Obviously, an offer to provide replacement

8

equipment for vehicles which have disappeared as a result of the original equipment's failure makes the "recovery and exchange" program wholly inadequate. As of last Friday, Guillaume acknowledged the 1,422 of the Syslocate units we purchased that are not responding and therefore cannot be located.

In view of all of the communications we have had in which we discussed these issues and these losses with Mark, the proposal in the email is insulting. At this point, I do not believe you are negotiating in good faith and am unwilling to negotiate with you further.

My attorney will be contacting you shortly to further address your email and these issues in more detail.

Asbel

27. Thereafter, on April 14, 2009, and at my direction on behalf of NAL, NAL's counsel sent a demand letter to Syslocate/Procon ("Demand Letter," Exhibit "A" hereto). The Demand Letter described the losses NAL had sustained as a result of the failure of the majority of Syslocate units, and demanding payment for same. As stated in her Demand Letter, as of that date, NAL requested that Syslocate and Procon executives communicate only with her in regard to the claims set forth in this lawsuit:

> "All communications regarding this matter should be addressed to me, not to NAL."

28. At that time, there were no EULAS on either the Syslocate or Procon websites, and NAL had never executed any formal agreements with Syslocate (or Procon) pertaining to the units or the claims in this case.

29. In addition, the Syslocate website is completely independent and separate from the Procon websites. NAL does not access the Procon websites to perform any function related to the Syslocate units including tracking, monitoring, or evaluating data related to those units. Nor does NAL access the Syslocate site for any Procon related issues.

30.   On April 17, 2009, four days after our attorney sent the Demand Letter, a "Subscription Agreement" appeared for the first time on a Procon website which NAL must access to track vehicles in which Procon units are installed, and was brought to our attention by an employee. Although this Subscription Agreement was posted on a Procon website, and not the Syslocate website, we forwarded it to our counsel.

31.   On April 20, 2009, NAL's counsel also sent a letter to Procon, stating that NAL would not execute the agreement if it would be used against NAL in any manner in connection with the claims in this case (Exhibit "B" hereto).

32.   In addition, I sent out the following e-mail to our employees and all NAL Email users, to make sure no one clicked through it:

> **From:** Asbel Perez
> **Sent:** Monday, April 20, 2009 1:57 PM
> **To:** All email users
> **Subject:** PROCON REQUESTING APPROVAL OF NEW TERMS
>
> Team,
>
> Anyone who logs into the PROCON website must not accept any new terms or conditions if asked.
>
> If anyone has any questions please speak directly to Johanna.
>
> Thank you
> Asbel

33.   After our attorney wrote to Procon and spoke with its attorneys, it was our clear understanding that Procon would not use any Agreements on the Procon websites against NAL to limit or affect the claims NAL has asserted in this case for the defective Syslocate units, based on his statement that his client "has agreed not to assert that the Goldstar Agreement bars any of

your client's claims related to products purchased from Syslocate." (See letter from Procon's counsel, William E. McClamroch, III sent to our attorney on May 1, 2009, Exhibit "C" hereto).

34.     The "Goldstar Agreement" referred to in his letter, was at that time, the only agreement which had been posted on Procon's websites. Based on these communications, we also believed that Procon would not further attempt to revise the agreement (which it had indicated would not apply to NAL's claims in this case) or post "new" or "amended" agreements again containing terms it would try to use against NAL in this case (as it has done in its Motion), as we had informed Procon that we would not agree to any such terms.

35.     In addition, since NAL was no longer purchasing or activating the Syslocate units which are the subject of this lawsuit, it did not make sense to us that agreements being placed on the Procon websites so long after their purchase should impact its claims in this case in any event.

36.     Based on the fact that we had advised both Syslocate and Procon that we would not agree to the terms of any agreement which would impact NAL's claims for the defective Syslocate units, the fact that Syslocate and Procon knew that Mr. Ramos and I were the decision makers for NAL, the fact that we do not use the Procon websites to track Syslocate units, and finally, the letter from Procon's counsel dated May 1st (which we received on or after May 12th), we understood that no agreements on the Procon websites would be used to try to defend against NAL's claims in this case. Therefore, we did not at that time ask Procon to close all access to our accounts, as we had done in November, when DOS tried to trick us into releasing claims with the earlier click-through EULA on the Syslocate website.

37.     However, I never lifted my email instructions to employees issued on April 20, 2009, not to agree to any terms posted on the Procon websites. Evidently, despite this

instruction, someone with access to NAL's accounts did not understand or read the email and appears, based on the Wells Affidavit, to have clicked-through the May Access Agreements posted only weeks before its counsel had sent the letter stating that the agreement posted at that time would not apply to these claims. That person did not report or notify management that he or she had clicked-through the agreements. And once that person logged-in and clicked through once, other employees would not have seen the terms on log-ins thereafter. As a result, no one else saw the screen and reported it to management.

38. In that regard, our employees and consultants had to continue to access the Procon websites in order to track more than 1,900 vehicles (approximately $19 Million worth of assets) with Procon units installed, or risk the loss of millions of dollars in vehicle assets.

39. Thus, despite being specifically advised that all communications regarding the claims in this lawsuit were to be made through NAL's counsel, and that NAL would not agree to any terms which would limit or affect its claims in this case, Procon thereafter revised and posted the Amended Subscription Agreement and the Marketing Agreement attached to the Affidavit of Mark Wells on the website which must be accessed in order to track and activate Procon units, and is now attempting to use these agreements against NAL in this lawsuit, contrary to communications between NAL's officers and attorney and Procon's officers and attorney.

40. Neither I, nor any other officer of NAL ever assented to the terms of either of the agreements attached to the Wells Affidavit which Procon posted on its websites, nor would we have assented to them, to the extent they would be used or attempted to be used to affect or impair NAL's claims in this case and its rights to have its claims tried by this Court, a position which we had made Defendants' executives fully aware of before the May 2009 Agreements were posted.

41. Neither I, nor any other officer of NAL ever "clicked-through" the agreements filed in support of the Motion. Although NAL is unable to dispute that one of its employees or consultants must have clicked-through these agreements in order to perform duties involving tracking Procon units, or moving them between accounts, no such employee or consultant had authority to execute any agreement on behalf of NAL, as previously communicated in writing in a November 2008 email that I instructed to be sent to Syslocate (mentioned above), and by a letter sent to Procon by our attorney indicating that all communications be managed through her.

42. Neither I, nor any other officer of NAL with authority to bind it contractually ever had notice that the click-through agreements contained the terms relied on in the Motion to Dismiss, i.e., providing for arbitration, mediation, or venue in Tennessee for the claims which NAL had long before these agreements were posted, for the defective Syslocate units.

43. Indeed, we had expressly advised Procon's officers in prior communications made by us, and by our counsel, that NAL would not agree to any agreements which would apply to the claims in this case. We had also instructed our employees not to click-through any Procon Agreement terms. However, as stated above, because we believed based on representations of Procon's counsel that the Agreement we saw in April would not apply to the claims in this case, we did not ask Procon to close our accounts such that our many users would not have access to it in order to perform their duties related to tracking the 1,900 NAL vehicles with Procon units installed, and evidently, one of these users clicked-through the May Agreements without notifying management.

44. Furthermore, NAL received no additional consideration whatsoever for the purported "execution" of these agreements to the extent they were clicked-through by an NAL employee. Rather, Defendants posted them after receiving a demand letter from NAL counsel

13

describing its claims in this case, and now are improperly attempting to use them to limit NAL's claims in this case, long after they accrued, and even though Defendants knew that NAL would never agree to any terms limiting its rights to pursue its claims in this Court.

45. Moreover, as Wells and Boling, officers of Syslocate and Procon have been aware that Ozzie Ramos and I were the officers of NAL with authority to resolve this dispute since November of 2008, and that continued negotiations thereafter have not been successful, Procon's contention that NAL assented to, or would assent to the terms of the agreements to the extent that they might affect its claims in this case is an attempt to rely on its own deception in an unfair game of "gotcha."

46. Placing these agreements on the Procon websites, blocking access to those websites (and the ability to track 1,900 vehicles) absent click-through on the agreements, and then using the agreements to defend this case, after NAL made demands for resolution of its claims in this case, advised Defendants that it would not agree to any agreements limiting its rights with respect to its claims in this case, and that communications regarding resolution of the claims in this case had to occur through counsel, was and is, in our opinion, in bad faith, and relies on trickery and deception.

FURTHER AFFIANT SAYETH NAUGHT.

_____
ASBEL PEREZ

The foregoing instrument was acknowledged before me this 17TH day of SEPTEMBER, 2009, by ASBEL PEREZ. Such person: *(notary must check applicable box)*

- ☑ is/are personally known to me.
- ☐ produced a current Florida driver's license as identification.
- ☐ produced _____ as identification.

_____
Signature of Notary

CARLOS A. SANCHEZ, JR.
Comm# DD0763131
Expires 2/27/2012
Florida Notary Assn., Inc

CARLOS SANCHEZ, JR
Name of Notary (Typed, Printed or Stamped)

Commission Number (if not legible on seal)_____

My Commission Expires (if not legible on seal)_____

*180805v3*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing Affidavit of Asbel Perez in support of Plaintiff's Response to Defendants' Motion to Dismiss and/or Transfer Venue and Stay Proceedings to Compel Mediation and Arbitration was furnished on September 18, 2009 by the Court's CM/ECF electronic mail system to those parties registered to receive electronic notices of filings in this case.

/s/ *Elizabeth M. Bohn*
Elizabeth M. Bohn, Esq.
Florida Bar No. 288047